906 A.2d 1180

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Raymond SOLANO, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 5, 2005.

Decided Sept. 27, 2006.

whether the nature of the conduct and/or speech establishes *that it will not harm the child."* (emphasis added)).

718

Richard Anthony Webster, Esq., for Raymond Solano.

Terence Patrick Houck, Esq., Robert Douglas Rosner, Esq., James Bernard Martin, Esq., Amy Zapp, Esq., Doylestown, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Chief Justice CAPPY.

This is a direct appeal from the judgment of sentence of death imposed upon Appellant, Raymond Solano, following his conviction for first-degree murder.[1] For the reasons that follow, we affirm the judgment of sentence.

1. 42 Pa.C.S. §§ 722(4), 9711(h)(1); Pa.R.A.P. 702(b), 1941.

On May 28, 2003, a jury convicted Appellant of first-degree murder for the shooting death of Armondo Rodriguez.[2] Following the penalty hearing, the jury returned a sentence of death, finding one aggravating factor, causing a grave risk of death to persons in addition to the victim,[3] which outweighed the one mitigating factor listed by the jury as "childhood, environment and lack of parental nurturing".[4] The trial court formally imposed a death sentence on May 30, 2003. Following the denial of post-sentence motions, Appellant filed the instant direct appeal.

Although Appellant raises no challenge to the sufficiency of the evidence, where as here a defendant has been sentenced to death, this Court independently reviews the record to determine whether the evidence is, indeed, sufficient to support the verdict of first-degree. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 840 (2003); *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982). In performing that review, we must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner, are sufficient to establish the elements of first-degree murder beyond a reasonable doubt. *Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859 (2000). Evidence is sufficient to sustain a conviction of first-degree murder when the Commonwealth establishes that (1) a person was unlawfully killed; (2) the person accused did the killing; and (3) the accused acted with specific intent to kill. *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000). An intentional killing is one committed by means of poison, lying in wait, or by any other kind of willful, deliberate and premeditated actions. *Commonwealth v. Taylor*, 583 Pa. 170, 876 A.2d 916 (2005). And, the use of a deadly weapon on a vital part of the body is sufficient to establish the requisite specific intent to kill. *See Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90 (1995). Viewed in accordance with these

2. 18 Pa.C.S. § 2502(a).

3. 42 Pa.C.S. § 9711(d)(7).

4. 42 Pa.C.S. § 9711(e)(8).

standards, we find the evidence sufficient to support Appellant's conviction.

The evidence presented at trial established that at approximately 3:00 p.m. on June 3, 2001, a short, stockily built man wearing a dark hooded sweatshirt with the hood drawn over his head, walked onto a basketball court in Valenia Park in the city of Allentown, Pennsylvania and shot the victim, Armondo Rodriguez, several times at close range. After the victim fell to the ground, the assailant stood over him and shot him several more times. The assailant then ran towards a parking lot, turned around, and shot back towards the crowded park where the victim lay. At the time the first officer arrived, there were approximately twenty to thirty people in the immediate vicinity. There were several shell casings lying in the area where the victim lay and several more casings were found in or about the adjacent streets. The victim was transported to a local hospital where he was pronounced dead upon arrival. The autopsy revealed a total of six gunshot wounds, all but one of which were fatal wounds.

Jose Aquino, a friend of the victim's, who was also playing basketball at the time, identified Appellant as the assailant at trial. Mr. Jose Aquino testified that he saw Appellant standing near the court just prior to the shooting, talking on his cell phone and looking in the direction of the victim. He was able to see Appellant's face before and at the time Appellant came charging onto the court. He testified that he had seen Appellant a few days prior to the shooting, wearing the same hooded sweatshirt, but not with the hood over his head.

Another eyewitness, Israel Aquino, testified that he saw the shooter run towards the victim, shoot him several times, stand over him and shoot again. Mr. Israel Aquino testified that he started towards the victim, but when the assailant pointed a gun in his direction, he turned and ran in the opposite direction.

Francisco Rosario, another friend of the victim's who was also present at the time, testified that he ran as the shooting began. He took cover behind a parked vehicle and pulled out

his own gun in an attempt to shoot the assailant. His gun, however, failed to discharge. As the police arrived, Mr. Rosario placed the gun in the car. The police eventually recovered that gun and when Mr. Rosario admitted ownership thereof, he was charged with possession of a firearm. At the time of the instant trial, Mr. Rosario had completed his sentence for that charge. With respect to the identity of the shooter, Mr. Rosario testified that while he initially told police that he did not see the shooter because he was afraid, he, in fact, saw the shooter and identified Appellant as that shooter.

On June 19, 2001, police in Hartford, Connecticut received information that Appellant, wanted in connection with the instant murder, and Cantalino Morales, wanted for attempted murder of deputy sheriffs in Allentown, were staying together in Hartford. After being provided descriptions of the suspects, the police proceeded to a given location in the Westbrook Village section of Hartford. When they arrived, they observed two individuals, one of whom matched the description they had been given of Cantalino Morales, apparently trying to jump-start a vehicle. When the individuals were successful in starting the vehicle, the police, believing the subjects were about to leave, moved in on them, announcing their presence and ordering the two people to "get down." One of the individuals, later identified as Morales, pulled a gun and began shooting towards the officers. At about the same moment, a man, later identified as Appellant, and a female companion exited the rear of the building. Both Appellant and Morales fled on foot, with Morales shooting towards police as he fled. As he was running, Morales was observed dropping an object which police later recovered and identified as a 9mm Ruger. Both individuals were apprehended a few moments later, Appellant as he attempted to dive into a wooded area, and Morales who, after pointing another gun towards police, fell only a short distance away from Appellant when he was hit by police gunfire. The gun Morales was holding at the time he was shot was recovered from the scene and identified as a Standard Arms. At the time of his arrest, Appellant's person was searched and, among other things, a handcuff key

and a magazine containing live bullets were discovered in his pocket.

The Commonwealth presented a ballistics expert, John Curtis, Jr., who testified that the casings and bullets recovered from the basketball court and properties adjacent to the park were all discharged from the same two firearms found at the time of Appellant's and Morales' arrest. Specifically, he found that fifteen shell casings recovered from the scene of the murder and two adjacent streets were discharged from the Ruger semiautomatic pistol, as were the bullets removed from the victim's body, one bullet found embedded in a wall in a nearby garage, and another bullet lodged in a wall in a second floor room of a nearby home. Four additional shell casings which were found behind a building a short distance further from the scene were fired from a Standard Arms semiautomatic pistol.

In his defense, Appellant presented the testimony of Detective Joseph Effting, of the Allentown Police Department. Detective Effting testified that he had interviewed two eyewitnesses, Jessica Brown and Julio Santiago, who indicated that persons other than the shooter possessed guns at the time and may have also been shooting. According to Detective Effting, at the time he interviewed Ms. Brown she told him that she had seen the shooter and thought that possibly as many as three other persons had guns in the park that day. Ms. Brown testified for the Commonwealth, however, that she observed no one but the assailant with a gun but had assumed that someone other than the fleeing assailant was shooting because the assailant was shooting back towards the crowd. As for Mr. Santiago, Detective Effting testified that when interviewed, Mr. Santiago told him that he thought an individual behind a Jeep may have also been shooting, and that he saw an unidentified individual chasing the shooter as he fled. However, when he testified for the Commonwealth at trial, Mr. Santiago denied having given Detective Effting any such information.

Appellant took the stand and testified that he was in Hartford, Connecticut the day of the shooting staying with his

aunt. He testified that he did not even know the victim and did not know Mr. Morales before meeting him in Connecticut. Although he testified that he saw numerous people while in Hartford, the defense presented no witnesses to corroborate Appellant's testimony that he was there at the relevant time.

This evidence, when viewed in a light most favorable to the Commonwealth, is clearly sufficient to establish that the victim was intentionally killed and that Appellant was the person who shot the victim at point blank range.

In his brief to this Court, Appellant raises a challenge to the weight of the evidence yet seemingly concedes in his argument that the weight of the evidence is indeed, sufficient to support the verdict.[5] The question of weight of the evidence is one reserved exclusively for the trier of fact who is free to believe all, part, or none of the evidence and free to determine the credibility of witnesses. *Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403, 408 (2003). We, as an appellate court, may not substitute our judgment for that of the trier of fact and may reverse the findings of the trier of fact only where the verdict is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Begley*, 566 Pa. 239, 780 A.2d 605, 619 (2001). Here, not only does Appellant concede the inadequacies of this claim, but our independent review of the record also fails to demonstrate that the verdict shocked one's sense of justice. As summarized above, the evidence presented at trial clearly demonstrates an intentional killing, and while Appellant testified to an alibi, he offered little, if any, support for that claim. Given this weak evidence of alibi, the jury's decision to credit the four Commonwealth eyewitnesses' testimony claiming that Appellant was, indeed, the shooter certainly does not shock one's sense of justice. Accordingly, this claim provides Appellant no relief.

Next, we address Appellant's claim that the trial court erred in denying his motion to dismiss the charges pursuant to

---

**5.** For ease of discussion, we address the issues presented by Appellant in an order different than presented in his brief to this Court.

Pa.R.Crim.P. 600 (formerly Rule 1100) for failure to bring him to trial within 365 days. Our standard of review of such a determination is that of an abuse of discretion. *Commonwealth v. Hill,* 558 Pa. 238, 736 A.2d 578, 581 (1999). Our scope of review is limited to the record evidence from the Rule 600 hearing and the findings of the lower court, reviewed in the light most favorable to the prevailing party. *Id.*

In pertinent part, Rule 600, provides:

(A)(2) Trial in a court case in which a written complaint is filed against the defendant, when the defendant is incarcerated on that case, shall commence no later than 180 days from the date on which the complaint is filed.

(3) Trial in a court case in which a written complaint is filed against the defendant, when the defendant is at liberty on bail, shall commence no later than 365 days from the date on which the complaint is filed.

. . . .

(C) In determining the period for commencement of trial, there shall be excluded therefrom:

(1) the period of time between the filing of the written complaint and the defendant's arrest, provided that the defendant could not be apprehended because his or her whereabouts were unknown and could not be determined by due diligence;

(2) any period of time for which the defendant expressly waives Rule 600;

(3) such period of delay at any stage of the proceedings as results from:

(a) the unavailability of the defendant or the defendant's attorney;

(b) any continuance granted at the request of the defendant or the defendant's attorney.

. . . .

(E) No defendant shall be held in pre-trial incarceration on a given case for a period exceeding 180 days excluding time described in paragraph (C) above. Any defendant held

in excess of 180 days is entitled upon petition to immediate release on nominal bail.

. . . .

(G) For defendants on bail after the expiration of 365 days, at any time before trial, the defendant or the defendant's attorney may apply to the court for an order dismissing the charges with prejudice on the ground that this rule has been violated.

At the Rule 600 hearing, held on May 12, 2003, Appellant took issue with the thirty-five day delay between February 21, 2002, the date his preliminary hearing was originally scheduled, and March 28, 2002, the date of the actual preliminary hearing. The facts adduced at the Rule 600 hearing establish that Appellant appeared on February 21, 2002, for the scheduled preliminary hearing without counsel. The record does not establish that either party requested a continuance, only that the court granted a continuance so that Appellant could obtain counsel. In its May 20, 2003, order denying the Rule 600 motion, the trial court explained that it found the delay occasioned by Appellant's failure to have counsel present on the date originally scheduled for the preliminary hearing to be excludable against Appellant since notwithstanding that Appellant did not expressly request a continuance, he nevertheless acquiesced in the delay which was solely for his benefit. Presently, Appellant argues that since the continuance was not "requested" by him, the delay should not be attributable to him. The Commonwealth, on the other hand, submits that Rule 600 does not apply to capital defendants and, assuming arguendo that it does apply, that the rule was not violated in the instant case because after considering time excludable to Appellant, trial commenced within the requisite 365 days.

It seems incumbent that we first address the issue of whether, indeed, Rule 600 applies to capital defendants. The Commonwealth submits that the rule itself does not apply to capital defendants since such defendants are not entitled to bail or dismissal of charges. The Commonwealth posits that inapplicability of Rule 600 in capital cases makes sense given the gravity of the case which calls for a more in-depth and

lengthier preparation by all parties. Because, pursuant to Article 1, Section 14 of the Pennsylvania Constitution a defendant charged with a capital crime is not entitled to bail, the Commonwealth submits that Rule 600's remedy of dismissal cannot apply to capital defendants. To support its claim, the Commonwealth presumably relies upon the language of subsection (G) of the rule which provides for the remedy of dismissal only for those defendants out on bail after the expiration of the 365 days. The Commonwealth further submits that in *Commonwealth v. Hill, supra,* this Court held that the remedy of dismissal under the speedy trial rule does not apply to capital defendants.

■ The Commonwealth, however, misconstrues our holding in *Hill.* In *Hill,* we did not definitively hold whether or not the remedy of dismissal was available to a capital defendant when a violation of Rule 600 has occurred.[6] Rather, after noting the fact that a capital defendant cannot be released on bail, and that Rule 600 provides for dismissal of charges only for those defendants out on bail who have not been brought to trial within 365 days of the date of the filing of the complaint, as well as Superior Court case law holding that a capital defendant was entitled to neither dismissal of charges nor nominal bail under Rule 600, we noted that the decision in *Commonwealth v. Spence,* 534 Pa. 233, 627 A.2d 1176 (1993) suggests the contrary, that the remedy of dismissal is available to a capital defendant who is not brought to trial within 365 days of the filing of the complaint. Concluding that after considering the excludable time attributable to Hill, he was tried within the requisite 365 days, we did not definitely state whether dismissal would be an available remedy. Subsequently, in *Commonwealth v. Boczkowski,* 577 Pa. 421, 846 A.2d 75 (2004), we addressed a capital defendant's claim that the trial court had erred in denying his Rule 600 motion to

6. Effective April 1, 2001, Pa.R.Crim.P. 1100 was renumbered as Rule 600. The prior numeration of this rule, Rule 1100, was in effect at the times pertinent to the appeals in *Hill* and *Commonwealth v. Boczkowski,* 577 Pa. 421, 846 A.2d 75 (2004). Because the renumeration of the rule, now Rule 600, is in effect in the instant appeal, we will refer to the applicable rule as Rule 600.

dismiss and explicitly held that pursuant to Rule 600, a capital defendant must be brought to trial within 365 non-excludable days of the filing of the complaint against him. The issue of whether dismissal of charges was warranted was not addressed in that case because, again, consideration of excludable time rendered the appellant's trial timely under the rule. Implicit in our holding, however, is the notion that a remedy of some sort must be available to a capital defendant who has not been brought to trial within the time constraints of Rule 600.[7] In any event, here Appellant is not entitled to any such remedy since, as demonstrated by the following discussion, he was brought to trial within the requisite 365 days.

The complaint in this matter was filed on June 4, 2001. Since a capital defendant is required to be tried within 365 days of the filing of the criminal complaint, the mechanical

7. While our state speedy trial rule, of course, emanates from the constitutional right, both federal and state, of an accused to a speedy trial, the procedural rule and the constitutional guarantees provide independent bases for asserting a claim of undue delay in appropriate cases. *See Commonwealth v. DeBlase*, 542 Pa. 22, 665 A.2d 427, 431 (1995). Nevertheless, the remedy of dismissal for a violation of either appears universal, the only variation being whether it is dismissal with or without prejudice. For instance, in *Barker v. Wingo*, 407 U.S. 514, 522, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the seminal United States Supreme Court case setting forth the specific factors the Court would balance in determining whether a defendant's speedy trial right had been violated, the Court made clear that dismissal of the indictment is the "only possible remedy" for a violation of one's Constitutional right to a speedy trial. In *Commonwealth v. Hamilton*, 449 Pa. 297, 297 A.2d 127, 131 (1972), a murder case wherein we first directed our Criminal Procedural Rules Committee to draft a rule fixing a maximum time limit in which to bring an accused to trial, we cited with approval the *Barker* Court's pronouncement that only the dismissal of charges with prejudice would prove a sufficient remedy. Otherwise, the right to a speedy trial would be rendered meaningless. Further, we noted that several states had already enacted statutes setting forth specific time limits in which an accused must be brought to trial and noted that while some enforce those time limits by barring subsequent prosecutions altogether, others bar subsequent prosecutions in particular classes of cases only. *See id.* at 130, 133.

Given the uncertainty that has arisen over the years since the drafting of the original speedy trial rule pursuant to our directive in *Hamilton*, particularly with respect to our speedy trial rule's application to capital cases, we deem it proper to again refer the matter to our Criminal Procedural Rules Committee for further study and recommendation.

run date for purposes of Rule 600 is June 4, 2002.[8] Appellant's jury trial commenced on May 12, 2003, 707 days after the filing of the complaint. At the hearing, Appellant's counsel seemingly conceded, however, that from that time period, the following delays were appropriate to exclude: (1) the 15 days between the filing of the complaint on June 4, 2001, and June 19, 2001, the date of his arrest; (2) the 240 days between the date of his arrest and February 14, 2002, the date of his sentencing on the charges filed in Connecticut and his waiver of extradition; and (3) the 70 days between September 23, 2002, and December 2, 2002, because Appellant had requested that the September 23, 2002 trial date be continued. Excluding these delays, which total 325 days, leaves 382 days between the filing of the criminal complaint and the commencement of Appellant's trial.

As noted above, the trial court also found the 35–day delay between the date on which the preliminary hearing was originally scheduled and the date it was actually held to be excludable against Appellant. Respecting Appellant's present argument that this period should not be counted against him because he did not request the continuance, we find controlling our prior decision in *Commonwealth v. Manley*, 503 Pa. 482, 469 A.2d 1042, 1044 (1983). In *Manley*, this Court held that when an accused appears for a court proceeding without counsel and without waiving his right to counsel, the period of delay caused thereby is excludable from the Rule 600 computation. Thus, the fact that Appellant did not expressly seek the continuance is not determinative of whether the delay is attributable to him; rather, the focus is whether his failure to obtain counsel on his behalf was the direct cause of the delay. *See id.* Also, there is no record of Appellant having waived his right to counsel nor does Appellant contend

8. The "mechanical run date" is the date by which the trial must commence pursuant to the time limitations set forth in Rule 600. Here, it is calculated by adding 365 days to the date on which the criminal complaint was filed. Where, as here, there are periods of delay in the commencement of the trial properly chargeable to the defendant, those periods of time are deemed excludable from the Rule 600 calculation. *Commonwealth v. Cook*, 544 Pa. 361, 676 A.2d 639 (1996).

that he had, in fact, waived his right to counsel. Accordingly, we hold that the trial court properly found this 35–day delay to be excludable from the computation of the 365–day period within which to bring Appellant to trial. Thus, Appellant's total excludable time at this point is 360 days. Subtracting these 360 days from the 707 days between the filing of the complaint and the date of trial leaves only 347 non-excludable days between the filing of the complaint and the start of trial. Since excluding this 35–day period brings the commencement of trial within the requisite 365–day window, the trial court did not err in denying the motion to dismiss. Appellant's Rule 600 claim therefore fails.[9]

Appellant also asserts that the trial court erred in refusing to give the jury an instruction on third-degree murder. Relying upon the decision in *Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142 (1974), Appellant maintains that the jury, alone, is to determine the degree of murder irrespective of whether the evidence supports a finding of a lesser degree of murder. He adds, however, that the following testimony of Lucy Hernandez nevertheless supports a third-degree murder instruction:

Q. All right. Now, when you were back in your house, what, if anything, happened?

A. The only thing I could recall was that I heard—you know, there was people out in the basketball court.

Q. Right.

A. The next thing, I went in, I did whatever—I heard some commotion or something at the basketball court then I seen two gentlemen going at it.

Q. Right.

9. Appellant also argues that the 161 days that the trial court took in deciding five pre-trial motions filed by Appellant should not be attributable to him for purposes of the Rule 600 calculations. Appellant did not, however, present this claim at the time of the Rule 600 hearing and, in any event, consideration of the claim is unnecessary since, even assuming this 161–day period is not attributable to him, the fact remains that the trial commenced within 347 days of the filing of the complaint.

A. The next thing you know, the one like shot the one, he fell, I kind of panicked because my kids were out there. So, what I did was I grabbed my phone and called 911. N.T. 5/23/03 p. 93.

 The trial court refused the requested charge concluding that there was no evidence presented that would suggest the murder was committed with anything other than specific intent. Third-degree murder is established when the killing is committed with malice aforethought, but without specific intent. 18 Pa.C.S. § 2502(a), (c); *Commonwealth v. Thomas,* 552 Pa. 621, 717 A.2d 468 (1998). Recently, in *Commonwealth v. Taylor,* 583 Pa. 170, 876 A.2d 916 (2005), this Court rejected the appellant's claim that the trial court had erred in refusing to instruct on diminished capacity and third-degree murder, concluding that the evidence presented did not warrant such instruction. There we noted that the law is clear that a trial court should not instruct a jury on legal principles which bear no relationship to the evidence presented at trial. *See also Commonwealth v. Browdie,* 543 Pa. 337, 671 A.2d 668 (1996). In the instant case, the evidence unequivocally established that the victim was intentionally killed after being shot several times at close range. Appellant, himself, raised no claim that the killing was anything other than intentional; rather, he asserted that he was not the shooter, claiming he was in Connecticut at the relevant time. And, the innocuous statement uttered by Lucy Hernandez simply does not provide sufficient evidence to warrant a third-degree murder charge. Accordingly, we hold that the trial court properly refused to instruct the jury on third-degree murder.[10]

 Next, we address Appellant's claim that the trial court erred in failing to issue a cautionary instruction following testimony by "a police officer witness" that Appellant had been investigated for other criminal activity. Appellant does not identify which particular witness allegedly testified to such

10. The holding in *Jones, supra,* the case relied upon by Appellant, has been limited to criminal homicides brought pursuant to the 1939 Penal Code which did not define the crimes of murder and voluntary manslaughter. *See Browdie,* 671 A.2d at 673–74.

matters, nor does he set forth citation to the record where such testimony can be found. However, in its Pa.R.A.P. 1925(a) opinion, the trial court surmises that in making this argument, Appellant may be referring to the testimony of Detective Simock. On direct examination, Detective Simock was asked whether following issuance of the arrest warrant for Appellant, he notified any other authorities or media of the fact that Appellant was wanted for this homicide. In responding to that inquiry, Detective Simock stated in relevant part:

> A....on June 11th of 2001, we actually had a press conference at the Allentown Police Department in which the information was given out to the press that Mr. Solano and a group of five others were wanted in connection ... not just to this homicide, but there were other shootings in the....

N.T. 5/27/03 p. 96. Defense counsel immediately objected and at sidebar, asked for a mistrial claiming that the testimony impermissibly indicated that Appellant was wanted for additional crimes. The prosecutor insisted that the testimony referred to the fact that the press conference covered additional shootings in which Appellant was not involved, and did not implicate Appellant in those additional incidents. After being advised by the court to get the testimony clarified, the prosecutor, via further testimony of Detective Simock, made clear that Appellant was wanted for this murder only and that the press conference also dealt with other incidents in which Appellant had no involvement. Because Appellant takes no issue with the trial court's summation of what testimony is at issue here, we assume for purposes of this argument that it is, indeed, this testimony of Detective Simock to which Appellant refers. Since the further testimony of Detective Simock made clear the fact that Appellant was wanted in connection with the instant shooting only, and since no further objection was rendered, we see no merit to Appellant's claim that a cautionary instruction was warranted.[11] *See Commonwealth v. Car-*

---

11. Our independent review of the record reveals no other instances in which the defense challenged on a similar basis proffered testimony of a police witness.

*penter*, 511 Pa. 429, 515 A.2d 531 (1986) (if a party fails to request a cautionary instruction contemporaneously with objectionable testimony he may not complain after trial that such instruction was warranted); *see also* Pa.R.Crim.P. 605.

In his next two claims, Appellant submits that it was error to allow into evidence photos of the victim taken at the autopsy, photos from the crime scene which depict the pool of blood around where the victim had lain, photos of the blood-stained shirt of the victim, and the actual shirt worn by the victim that day. Appellant maintains that the inflammatory nature of these items far outweighs any probative value.

The trial court ruled that these items were admissible because they were relevant to the Commonwealth's theory that Appellant intentionally killed the victim by shooting him at close range and then shooting him several more times as he lay on the ground. This probative value, tempered by the court's instructions to the jury explaining the appropriate use of this evidence, the court found to sufficiently minimize any prejudicial impact this evidence could have had on the jury.

Initially, it must be noted that Appellant objected at trial to only the admission of the photographs depicting the shirt and shorts worn by the victim the day of the shooting and the photographs depicting the pools of blood on the basketball court where the victim's body had lain. The photographs from the autopsy and the actual shirt and shorts worn by the victim that day were admitted without objection. Accordingly, Appellant has waived all but his claim regarding the admission of the photos depicting the shirt and shorts and the pools of blood.

The admission of photographs is a matter vested within the sound discretion of the trial court whose ruling thereon will not be overturned absent an abuse of that discretion. *Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767 (2004). This Court has long recognized that photographic images of the injuries inflicted in a homicide case, although naturally unpleasant, are nevertheless oftentimes particularly pertinent to the inquiry into the intent element of the crime of

murder. *See, e.g., Commonwealth v. McCutchen,* 499 Pa. 597, 454 A.2d 547 (1982); *Commonwealth v. Marinelli,* 547 Pa. 294, 690 A.2d 203, 216 (1997)(the mere fact that blood is visible in a photograph does not necessarily render the photograph inflammatory). In determining whether the photographs are admissible, we employ a two-step analysis. First, we consider whether the photograph is inflammatory. If it is, we then consider whether the evidentiary value of the photograph outweighs the likelihood that the photograph will inflame the minds and passions of the jury. *Commonwealth v. Marshall,* 537 Pa. 336, 643 A.2d 1070, 1074 (1994). Even gruesome or potentially inflammatory photographs are admissible when the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. *Commonwealth v. Gorby,* 527 Pa. 98, 588 A.2d 902, 908 (1991).

The first set of photographs at issue depict the bloody shirt and shorts worn by the victim at the time of the murder and were admitted by the prosecution to assist in establishing that Appellant intentionally killed the victim by shooting him at close range and then standing over the victim after he fell and shooting him several more times. Upon viewing these photographs, we conclude that they are not inflammatory, and, in any event, the evidentiary value thereof clearly outweighs any potential prejudice. Certainly the photographs were relevant to demonstrate the number and location of the bullet holes, and also to bolster the Commonwealth's forensic evidence indicating that although the victim was shot at close range, the excessive blood loss rendered it difficult to obtain residue samples on the victim's shirt that would have enabled the prosecution to determine the precise distance from which the bullets were fired, all of which weighs in on the element of intent. Our review of the photographs in which pools of blood are visible leads us to a similar result. As the trial court noted at the time it overruled the objection, notwithstanding the amount of blood visible, the photographs depict the close proximity of several shell casings to the victim and thus, were also relevant to the Commonwealth's theory

that the victim was shot at close range. Further, the court cautioned the jury that while the photographs may be disturbing to some of the panel members, they should not be swayed emotionally by those photographs to the detriment of Appellant, but rather should view them for their evidentiary value only. Accordingly, the court did not abuse its discretion in admitting these items.

 Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), we are required to affirm the sentence of death unless we determine after review that the sentence was the product of passion, prejudice or any other arbitrary factor, or that the evidence fails to support the finding of at least one aggravating factor. Here, the jury unanimously found that in the commission of this murder, Appellant knowingly created a grave risk of death to another person in addition to the victim. *See* 42 Pa.C.S. § 9711(d)(7). Several eyewitnesses testified at trial that in retreating from the victim, Appellant fired several shots towards the crowd gathered in the park. Additionally, Angel Rolon, who at the time of the shooting lived in a single family dwelling adjacent to the park, testified that shortly before 3:00 p.m. on June 3, 2001, he heard shots being fired and ran to a second floor playroom where his four children were playing. He ran into the room and immediately gathered his four children under him as he lay on top of them. Seconds later, a bullet came through the door to that room and lodged in the wall. He testified that before he gathered his children, one of them had been sitting in a chair in direct line of the path of that bullet. Thus, the evidence was sufficient to support the finding of this particular aggravating factor. Further, our independent review of the record reveals no evidence of passion or prejudice or consideration of any other arbitrary factor on the part of the jury in the rendering of this sentence.

Accordingly, we affirm the judgment of sentence.[12]

12. The Prothonotary of this Court is directed to transmit to the Governor of this Commonwealth a full and complete record of this case in accordance with 42 Pa.C.S. § 9711(i).

738

Justice CASTILLE, Justice NEWMAN and Justices SAYLOR, EAKIN and BAER join the opinion.

Former Justice NIGRO did not participate in the consideration or decision in this matter.