J-A22021-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. D'BIAGIO | : | |
| | : | |
| Appellant | : | No. 465 WDA 2024 |

Appeal from the Judgment of Sentence Entered December 6, 2023
In the Court of Common Pleas of Lawrence County Criminal Division at
No(s): CP-37-CR-0000627-2019

BEFORE: MURRAY, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY McLAUGHLIN, J.:         **FILED: January 8, 2025**

Michael J. D'Biagio appeals from the judgment of sentence following his conviction for first-degree murder.[1] He challenges the sufficiency and weight of the evidence, the court's decision not to colloquy the jurors, and the court's denial of his request for certain jury instructions. We affirm.

The trial court summarized the facts as follows:

> Dawnette Servick, formerly Dawnette D'Biagio, is [D'Biagio's] ex-wife who testified [D'Biagio] experienced bouts of extreme paranoia and depression throughout the duration of their marriage. In 2016, [D'Biagio] began receiving mental health treatment after Ms. Servick provided him with an ultimatum where he either sought treatment or she would divorce him. She indicated the medication was working to alleviate the issues of paranoia [D'Biagio] was experiencing. However, in 2018, [D'Biagio] had a period of time where he appeared to be catatonic and he was staying with his parents.

---

[1] 18 Pa.C.S.A. § 2502(a).

In July of 2019, [D'Biagio] was taking Risperdal, Klonopin and Zoloft for his mental health issues. During that month, the mother of a friend of [D'Biagio's] 14-year-old daughter, M.D., suggested they test M.D. for marijuana usage as her child smoked marijuana. In response, [D'Biagio] and Ms. Servick prohibited M.D. from seeing her friends and her cell phone was confiscated. [D'Biagio] and Ms. Servick searched the cell phone and discovered photographs of M.D. smoking marijuana and photographs of a sexual nature showing she had bruises on her legs from being bitten by her boyfriend and the victim[.]

On July 19, 2019, Ms. Servick and M.D. traveled to Ross Park Mall to visit a bookstore. While traveling to the mall, Ms. Servick asked M.D. what other drugs she tried and encouraged her to be honest because they would test her hair. M.D. stated she used cocaine while in a car in New Castle, Pennsylvania. Ms. Servick contacted [D'Biagio] at approximately 2:00 p.m. and informed him that M.D. used cocaine. [D'Biagio] demanded to speak with M.D. and he began yelling at her in manner Ms. Servick never heard him speak to their children.

When he received that news from his wife and daughter, [D'Biagio] was at Whitmore Engineering where he was employed. [D'Biagio] went to an office to speak with a co-worker, Rena Bowser. He informed Ms. Bowser that M.D. used drugs in New Castle. Ms. Bowser attempted to calm [D'Biagio]. At the end of their conversation, [D'Biagio] said he was going to kill the victim and Ms. Bowser would not see him next week. Ms. Bowser advised him not to do that and she believed [D'Biagio] was referring to a planned vacation when he said he would not be at work the following week.

[D'Biagio] drove to his residence, emptied his pockets and retrieved a firearm. He then texted his other daughter, A.D., that he loved her. [D'Biagio] obtained M.D.'s cell phone as it contained a map with the locations of all her friends. [D'Biagio] noticed the victim was in Ellwood City, Pennsylvania, so he drove there. At one point, [D'Biagio] explained he followed a vehicle because he believed [the victim] was in that vehicle. Eventually, [D'Biagio] checked the cell phone again and the victim was on State Route 18. [D'Biagio] contacted the victim via the Facetime application

- 2 -

and stated he wished to speak with the victim, who responded he was at Scustie's Pizza in New Castle.

When [D'Biagio] arrived at Scustie's Pizza, the victim was already outside as he took a break from his employment to meet with [D'Biagio]. Upon viewing the victim outside of Scustie's Pizza, [D'Biagio] brandished the firearm and said "you got my daughter hooked on drugs." The victim turned to run and [D'Biagio] began shooting. The victim then fell to the ground. At this time, Joseph Camerot, the owner of Scustie's Pizza, went outside and he saw the victim on the ground. He then viewed [D'Biagio] approach the victim and shoot him in the head at close range. According to [D'Biagio], he observed the victim suffering while he was on the ground causing [D'Biagio] to feel sympathy so he shot the victim in the head. Anthony Pruchnic, a pizzamaker at Scustie's Pizza, also went outside and he observed the victim on the ground. Mr. Pruchnic approached the victim and assessed his injuries.

Mr. Camerot observed [D'Biagio] walk away slowly, disassemble the firearm and place it on the ground. [D'Biagio] then said, "That's what drug dealers deserve." [D'Biagio] continued to walk toward his vehicle, opened the door and knelt down. [D'Biagio] called his daughter, A.D., to inform her that he did something terrible. Shortly thereafter, police arrived, [D'Biagio] willingly complied with all of their instructions, and he was placed in custody. The victim still had a pulse at the scene and he was transported to UPMC Jameson Hospital where he died as a result of the gunshot wounds inflicted by [D'Biagio].

\*\*\*

Sergeant Sheila Panella of the New Castle Police Department arrived a few minutes after [D'Biagio] was placed in custody . . . [D'Biagio] was transported to the New Castle Police Department where he was read his [***Miranda***] rights and was interviewed by Sergeant Panella. [D'Biagio] admitted to killing the victim. During that interview, [D'Biagio] explained he shot the victim several times, saw him bleeding and shot him at close range "to put him out of his misery."

\*\*\*

At trial, [D'Biagio] raised the defense of not guilty by reason of insanity which means [D'Biagio] committed the act, but due to his mental illness, he cannot be held legally responsible.

Trial Court Opinion, filed 4/5/24, at 2-5, 13.

At trial, D'Biagio presented the expert testimony of two medical doctors with specialties in the field of psychiatry, Dr. Sarah West and Dr. Peter Breggin, who opined that he was legally insane at the time of the homicide. The Commonwealth presented the expert testimony of Dr. Allan Pass, a licensed independent mental health practitioner in mental health counseling and forensic services, who opined that D'Biagio knew the nature and quality of his acts and knew those acts were wrong. The court summarized the experts' testimony as follows.

> Dr. West explained, on the date of the homicide, [D'Biagio] demonstrated disorganization based upon the manner in which he traveled around attempting to locate [the victim]. She also opined Klonopin can cause a person to be impulsive and uninhibited. According to Dr. West, [D'Biagio] did not consider the legal ramifications of his actions as he had to complete his mission. Ultimately, Dr. West opined [D'Biagio] was suffering from a schizo-psychotic disorder at the time of the incident which caused him to not know his actions were wrong. She further explained [D'Biagio] was on a preprogrammed mission to kill the victim and he remained calm after the homicide due to being relieved he completed his mission.
>
> ***
>
> Dr. Breggin noted [D'Biagio] had a long history of psychiatric issues and, on the day of the homicide, he became focused on the victim even though there was nothing to indicate the victim was responsible for providing cocaine to his daughter. According to Dr. Breggin, SSRI medications can cause imbalances in the brain driving

bizarre reactions. [D'Biagio] was taking Zoloft, an SSRI medication, on July 19, 2019. Dr. Breggin explained Zoloft is contraindicated for people who are suffering from mania. [D'Biagio] suffered from bi-polar disorder which can create a mixed manic episode. Dr. Breggin testified the warning signs include aggression, a confusional state and abnormal sleep or nightmares. He opined on the July 19, 2019, [D'Biagio] experienced a syndrome of SSRI induced obsessive suicidality and/or violence. Ultimately, Dr. Breggin stated [D'Biagio] was legally insane at the time of the homicide as he did not know the nature and quality of his acts.

The Commonwealth rebutted the expert testimony presented by [D'Biagio] through the testimony of Dr. Allan Pass . . .

Dr. Pass explained [D'Biagio] viewed the victim as a threat to the safety of his daughter and showed linear thought in the manner he perpetrated the homicide because he obtained a firearm from his home and utilized technology to locate the victim. According to Dr. Pass, [D'Biagio] felt pity for the victim as he laid on the ground in pain when [D'Biagio] shot the victim in the head at close range. Resultantly, Dr. Pass opined [D'Biagio] knew the nature and quality of his acts as well as knowing those acts were wrong.

*Id.* at 7-9.

During the fifth day of the trial, Juror No. 1 appeared in chambers with the trial judge and counsel and stated that two jurors were not taking the proceedings seriously. N.T., 10/23/23, at 3-4. She told the court that the two jurors were not listening to the witnesses, said that 99 percent of what was being said in court was irrelevant, said that they were falling asleep, were drawing in their notebooks and not taking notes, and were "more worried about what time they're going to get out of here and they keep looking at the clock[.]" *Id.* at 4-5. Juror No. 1 told the court that the two jurors' behavior

- 5 -

was not affecting her ability to listen to the evidence and make a decision, but she was "embarrass[ed] to be categorized with them because [she was] taking [the case] seriously." *Id.* at 4. The court then provided counsel for both parties an opportunity to question Juror No. 1, and they chose not to do so. *Id.* at 5-6. The court then sent Juror No. 1 back to the jury room and had a discussion with counsel. The court stated to counsel, "I don't know there's anything to do about that, it's just an impression that she has," and, "There is nothing wrong with jurors wondering what time they're going to get out of here or doodling." *Id.* at 6-7. Counsel agreed with the court that no further action was necessary. *Id.*

At the conclusion of the trial, the jury convicted D'Biagio of first-degree murder. He was sentenced to an aggregate term of incarceration of life without parole. D'Biagio filed post-sentence motions, which were denied. This appeal followed.

D'Biagio raises the following issues:

1. Whether the trial court abused its discretion and committed reversible error when it failed to find that the jury's verdict was based on insufficient evidence?

2. Whether the trial court abused its discretion and committed reversible error by not conducting a colloquy of all jurors in open court or giving cautionary instructions, when an issue of juror misconduct arises?

3. Whether the trial court abuses its discretion and commits reversible error when it fails to instruct the jury on third degree murder and to include that option on the verdict slip?

4. Whether the trial court abuses its discretion and commits reversible error when it fails to give the jury an instruction on voluntary manslaughter, and to include such option on the verdict slip?

5. Whether the trial court abuse[d] its discretion and commit[ted] reversible error when it failed to instruct the jury in a bifurcated manner concerning whether [D'Biagio] had rebutted his presumption of sanity, followed by a determination of legal insanity, or, if not, whether he was guilty of first-degree murder?

6. Whether the trial court abused its discretion and committed reversible error when it failed to find that the jury's verdict was against the weight of evidence?

D'Biagio's Br. at 8-13 (arguments omitted, issues reordered for ease of disposition).

## Sufficiency of the Evidence

D'Biagio first challenges the sufficiency of the evidence. D'Biagio does not deny that he killed the victim. Rather, he denies culpability due to his mental condition and his defense of insanity at trial. *Id.* at 17-18. He argues that he had two experts, who were medical doctors with expertise in the field of psychiatry, testify at trial that he was legally insane at the time of the homicide on July 19, 2019. *Id.* at 24, 28. Dr. West diagnosed D'Biagio with schizoaffective disorder and testified that he did not know that what he was doing on the day of the murder was wrong. *Id.* at 28. Dr. Breggin opined that D'Biagio's mental illness, combined with his taking Zoloft – which D'Biagio stresses was contraindicated – and the addition of Klonopin to his drug regimen 63 days before the victim's death, resulted in him committing the homicide. *Id.* at 28-29. D'Biagio emphasizes that the Commonwealth's

rebuttal expert witness, Dr. Pass, was a psychologist and not a medical doctor, and thus was not the same level as expertise as his experts. *Id.* at 24, 31. He notes that while Dr. Pass opined within a reasonable degree of forensic mental health certainty, his experts testified within a reasonable degree of medical certainty. *Id.* at 32. D'Biagio further stresses that he had no prior criminal history and no history of violence. *Id.* at 30. He concludes that since two medical doctors determined that he was insane at the time of the homicide, he could not have possessed the specific intent or *mens rea* to kill necessary for a first-degree murder conviction. *Id.* at 30-31.

The sufficiency of the evidence is a question of law. Therefore, "[o]ur standard of review is *de novo*, and our scope of review is plenary." ***Commonwealth v. Mikitiuk***, 213 A.3d 290, 300 (Pa.Super. 2019). When reviewing a challenge to the sufficiency of the evidence, we "must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt." ***Commonwealth v. Feliciano***, 67 A.3d 19, 23 (Pa.Super. 2013) (*en banc*) (citation omitted). "Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail." *Id.* (citation omitted). The factfinder, "while passing on the credibility of the witnesses and the weight of the evidence — is free to believe all, part, or none of the evidence." ***Commonwealth v. Miller***, 172 A.3d 632, 640 (Pa.Super. 2017).

This Court "may not substitute our judgment for that of the factfinder." ***Commonwealth v. Griffith***, 305 A.3d 573, 576 (Pa.Super. 2023), *appeal denied*, 319 A.3d 503 (Pa. 2024).

Murder of the first degree occurs "when it is committed by an intentional killing." 18 Pa.C.S.A. § 2502(a). An intentional killing is defined as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." ***Id.*** at § 2502(d). "To sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the accused was responsible for the killing; and (3) the accused acted with malice and a specific intent to kill." ***Commonwealth v. Williams***, 176 A.3d 298, 306-07 (Pa.Super. 2017). "The period of reflection necessary to constitute premeditation may be very brief; in fact the design to kill can be formulated in a fraction of a second. Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death." ***Commonwealth v. Drumheller***, 808 A.2d 893, 910 (Pa. 2002) (citation omitted). "The use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill." ***Commonwealth v. Rega***, 933 A.2d 997, 1009 (Pa. 2007).

Defendants "may be presumed sane for purposes of determining their criminal liability." ***Commonwealth v. Rabold***, 951 A.2d 329, 341 (Pa. 2008). However, a defendant may raise the defense of insanity. The defense of insanity is statutorily defined as follows:

> **(a) General rule.--**The mental soundness of an actor engaged in conduct charged to constitute an offense shall only be a defense to the charged offense when the actor proves by a preponderance of evidence that the actor was legally insane at the time of the commission of the offense.
>
> **(b) Definition.--**For purposes of this section, the phrase **"legally insane"** means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong.

18 Pa.C.S.A. § 315 (emphasis in original). "To plead the defense of insanity suggests that the defendant committed the act, but was not legally culpable." *Commonwealth v. Yasipour*, 957 A.2d 734, 738 (Pa.Super. 2008). "An insanity defense focuses upon a defendant's capacity, at the time of the offense, to understand the nature and quality of his actions or whether he knew that his actions were wrong." *Id.* The defendant has the burden to prove insanity by a preponderance of the evidence. *Id.* at 739.

The trial court found that the Commonwealth presented sufficient evidence that D'Biagio committed first-degree murder and was not mentally insane at the time. Trial Ct. Op. at 16. The court determined that the evidence showed that D'Biagio knew what he was doing as he decided to shoot the victim at close range to end his suffering and, immediately thereafter, he called his daughter, A.D., to explain he did something terrible. *Id.* He also disassembled the firearm and surrendered to the police officers. *Id.* Therefore, the court found that the Commonwealth presented sufficient evidence to sustain a verdict of guilty for the charge of first-degree murder. *Id.*

- 10 -

The court did not err in finding the evidence was sufficient. The record reflects that after D'Biagio received a phone call from his wife that M.D. was using cocaine, he told his co-worker that he was going to kill the victim, and then drove to his home to retrieve a firearm. He then deliberately drove from his home in Beaver County to New Castle with the firearm and used technology to locate the victim. Upon arriving at the victim's workplace, D'Biagio almost immediately shot the victim multiple times. He observed the victim suffering while he was on the ground, which caused D'Biagio to feel sympathy so he shot the victim in the head, a vital part of the body, at close-range. An eyewitness then heard D'Biagio say, "That's what drug dealers deserve." The evidence in this case showed that D'Biagio murdered the victim with specific intent and malice when he opened fire on the unsuspecting victim.

D'Biagio's sufficiency argument rests entirely upon the premise that he met the definition of legally insane because his experts testified that he did. However, the Commonwealth presented its own expert who opined that D'Biagio knew the nature and quality of his acts and knew those acts were wrong. It was within the jury's province to refuse to accept D'Biagio's experts' conclusions. *See Commonwealth v. Puksar*, 951 A.2d 267, 276 (Pa. 2008) (finding "[t]he expert testimony offered at trial by both sides amounted to a battle of the experts, with the jury as the ultimate referee based upon its assessment of the credibility of the experts"). Thus, there was sufficient evidence to sustain D'Biagio's conviction for first-degree murder.

**Jurors Issue**

In his second issue, D'Biagio argues that the court erred when it failed to conduct a colloquy of the jurors after Juror No. 1 alerted the court to her concerns that two other jurors were not taking the proceedings seriously. D'Biagio acknowledges that his counsel did not ask for further inquiry or move for a mistrial. D'Biagio's Br. at 37. However, he maintains that the court had a duty to act, *sua sponte*, and should have addressed the jurors with a cautionary instruction, conducted additional *voir dire* to determine if any jurors needed to be replaced with an alternate, or declare a mistrial. *Id.* D'Biagio argues that he suffered prejudice as a result. *Id.*

As D'Biagio recognizes, he did not object, move for a mistrial, or request that the court take any further action at trial in response to Juror No. 1's observations. His claim is therefore waived. *See* Pa.R.A.P. 302(a) ("[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal").

Even if the issue were not waived, the trial court did not err in failing to declare a mistrial *sua sponte*. "[A] trial court may exercise its *sua sponte* authority [to grant a new trial] only in truly exceptional circumstances," which are only where "exceedingly clear error" results in "manifest injustice." ***Temple Est. of Temple v. Providence Care Ctr., LLC***, 233 A.3d 750, 766 (Pa. 2020). We do not find such circumstances here.

## Jury Instructions

In his third issue, D'Biagio argues that the court erred in denying his request for a jury instruction on third-degree murder and diminished capacity. D'Biagio's Br. at 40, 44. In his view, the court should have instructed the jurors that they could find D'Biagio guilty of third-degree murder as an alternative to a verdict of first-degree murder. *Id.* at 41. He argues that "the evidence that he presented required the trial court giving the jury an alternative instruction because the evidence showed that [his] mental illness negated the specific intent to kill (needed for first-degree murder), but not the 'malice' required for third degree murder." *Id.* at 43.

"[O]ur standard of review when considering the denial of jury instructions is one of deference — an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Galvin*, 985 A.2d 783, 798-99 (Pa. 2009). "The key inquiry is whether the instruction on a particular issue adequately, accurately and clearly presents the law to the jury, and is sufficient to guide the jury in its deliberations." *Commonwealth v. Hamilton*, 766 A.2d 874, 878 (Pa.Super. 2001) (citation omitted). "[T]he law is clear that a trial court should not instruct a jury on legal principles which bear no relationship to the evidence presented at trial." *Commonwealth v. Solano*, 906 A.2d 1180, 1190 (Pa. 2006). "[I]nstructing the jury on legal principles that cannot rationally be applied to the facts presented at trial may confuse them and place obstacles in the path of a just verdict." *Commonwealth v. Hairston*,

84 A.3d 657, 668 (Pa. 2014) (citation omitted). Thus, "a criminal defendant must establish that the trial evidence would 'reasonably support' a verdict based on the desired charge and may not claim entitlement to an instruction that has no basis in the evidence presented during trial." ***Commonwealth v. Taylor***, 876 A.2d 916, 925-26 (Pa. 2005) (citation omitted).

"Third-degree murder is established when the killing is committed with malice aforethought, but without specific intent." ***Solano***, 906 A.2d at 1190; 18 Pa.C.S.A. § 2502(a), (c).

> The defense of diminished capacity,
>
>> whether grounded in mental defect or voluntary intoxication, is an extremely limited defense available only to those defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill . . .
>>
>> A diminished capacity defense does not exculpate the defendant from criminal liability entirely, but instead negates the element of specific intent. For a defendant who proves a diminished capacity defense, first-degree murder is mitigated to third-degree murder. To establish a diminished capacity defense, a defendant must prove that his cognitive abilities of deliberation and premeditation were so compromised, by mental defect or voluntary intoxication, that he was unable to formulate the specific intent to kill.

***Commonwealth v. Hutchinson***, 25 A.3d 277, 312 (Pa. 2011) (cleaned up).

Here, the trial court explained why it denied D'Biagio's request for a jury instruction on third-degree murder and diminished capacity:

> [T]he evidence presented clearly demonstrated [D'Biagio] killed the victim with specific intent. First, he prepared for the homicide by returning to his residence to obtain a firearm and his daughter's cell phone. According to

his own testimony, [D'Biagio] drove around attempting to locate the victim before contacting him via Facetime. He then arranged to meet the victim at his place of employment. Upon arriving, [D'Biagio] observed the victim already outside, so he exited his vehicle and began shooting at the victim. Once the victim fell to the ground, [D'Biagio] testified he approached the victim and shot him in the head at close range as he felt sympathy because the victim was suffering. There is no doubt the aforementioned series of events demonstrates the specific intent to kill required for first-degree murder and there were no facts presented to indicate the charge of third-degree murder was applicable to those facts. Thus, the [c]ourt properly refused to provide the jury with an instruction for third-degree murder.

Similarly, it was not appropriate for the [c]ourt to provide the jury with an instruction as it relates to diminished capacity. It is apparent from the testimony at trial [D'Biagio] was able to form the specific intent to kill as he performed several acts in preparation for the murder and formulated a plan to locate the victim. In doing so, [D'Biagio] demonstrated critical thinking in being able to formulate such a complex plan to perpetrate the murder based upon his belief the victim was at fault for M.D. using cocaine.

Trial Ct. Op. at 20-21.

We agree with the trial court that it properly refused to charge the jury on third-degree murder and diminished capacity. The evidence established D'Biagio intentionally killed the victim by shooting him several times at close range. There was no evidence from which the jury could conclude that specific intent was lacking. Accordingly, as the evidence did not warrant jury instructions for third-degree murder and diminished capacity, the court did not err in denying D'Biagio's request for such instructions. **See Solano**, 906 A.2d at 1190 (concluding that jury instruction on third-degree murder was not warranted in prosecution of defendant for first-degree murder as the evidence

unequivocally established that the victim was intentionally killed after being shot several times at close range and the evidence did not warrant such an instruction). No relief is due.

D'Biagio next argues the court erred in denying his request for a jury instruction on voluntary manslaughter due to mental illness, voluntary intoxication, and/or diminished capacity. D'Biagio's Br. at 50-51.

The voluntary manslaughter statute provides, in pertinent part, that "[a] person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by . . . the individual killed[.]" 18 Pa.C.S.A. § 2503(a)(1). A person is guilty of "heat of passion" voluntary manslaughter "if at the time of the killing he reacted under a sudden and intense passion resulting from serious provocation by the victim." *Commonwealth v. Ragan*, 743 A.2d 390, 396 (Pa. 1999). "Heat of passion" emotions include "anger, rage, sudden resentment or terror which renders the mind incapable of reason." *Commonwealth v. Mason*, 741 A.2d 708, 714 (Pa. 1999). "Whether the provocation by the victim was sufficient to support a heat of passion defense is determined by an objective test: whether a reasonable man who was confronted with the provoking events would become impassioned to the extent that his mind was incapable of cool reflection." *Hutchinson*, 25 A.3d at 314-15 (citation and internal quotation marks omitted). "[B]oth passion and provocation must be established, and . . . 'if there be provocation without passion, or passion without a sufficient cause of

- 16 -

provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder.'" ***Commonwealth v. Busanet***, 54 A.3d 35, 55 (Pa. 2012) (quoting ***Hutchinson***, 25 A.3d at 315). "[A] voluntary manslaughter instruction is warranted only where the offense is at issue and the evidence would support such a verdict." ***Commonwealth v. Sanchez***, 82 A.3d 943, 979 (Pa. 2013) (citation omitted).

In declining to allow a jury instruction for voluntary manslaughter the trial court reasoned as follows:

> [T]here was a lack of evidence presented at trial to demonstrate [D'Biagio] committed the homicide during a heat of passion despite [him] having just learned his daughter recently ingested cocaine. That information alone is not appropriate provocation to justify killing in the heat of passion for several reasons. First, while [D'Biagio's] daughter's drug usage is a serious concern, it does not immediately call for retaliation. Moreover, there was no information relayed to [D'Biagio] to indicate the victim was responsible for the drug usage by [his] daughter.
>
> The lack of appropriate provocation notwithstanding, [D'Biagio] was also subject to an adequate cooling off period before he committed the homicide. After learning of his daughter's drug usage, [D'Biagio] had the opportunity to speak with a co-worker, drive to his residence and traveled around the Ellwood City, Pennsylvania, area searching for [D'Biagio] before the victim informed [him] he was working in New Castle. [D'Biagio] then proceeded to travel from Ellwood City to New Castle where he killed the victim. In total, the series of events in this case lasted several hours which provided [D'Biagio] with ample opportunity to calm his emotions and it negates the applicability of voluntary manslaughter based upon heat of passion.

Trial Ct. Op. at 25-26.

The court did not err in declining to provide the jury with a voluntary manslaughter charge. There was no provocation by the victim and D'Biagio had a sufficient cooling off period. Thus, the court did not abuse its discretion since the evidence presented at trial did not support such an instruction.

D'Biagio next argues that the court erred when it failed to instruct the jury in a bifurcated manner. He maintains that the court should have instructed the jury that they first must decide whether he had rebutted his presumption of sanity and was legally insane, and, if not, then determine whether he was guilty of first-degree murder. D'Biagio's Br. at 46.

D'Biagio never asked the trial court to use this bifurcated procedure at trial. As such, the issue is waived. *See* Pa.R.A.P. 302(a).

**Weight of the Evidence**

Lastly, D'Biagio argues that the verdict was against the weight of the evidence. He maintains that the verdict was so unreliable that it shocks the conscience.

"We review a trial court's order denying a weight challenge for an abuse of discretion." *Commonwealth v. Fallon*, 275 A.3d 1099, 1107 (Pa.Super. 2022). Because the trial court heard the testimony firsthand, we must "give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence." *Id.* (citation omitted). A weight claim requires the defendant to first convince the trial court that "the evidence is so tenuous, vague and uncertain that the verdict shocks the conscience of the court."

- 18 -

*Commonwealth v. Windslowe*, 158 A.3d 698, 712 (Pa.Super. 2017) (internal quotation marks and citation omitted). This Court then reviews the trial court's decision in this regard for an abuse of discretion. *Id.* Further, "[t]he weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003) (citation omitted). "When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited." *Commonwealth v. Bowen*, 55 A.3d 1254, 1262 (Pa.Super. 2012) (citation omitted).

On this record, we cannot say that the trial court abused its discretion in finding the verdict did not shock the conscience. The jury was free to believe all, part, or none of the evidence presented. We thus affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 01/08/2025

- 19 -