J-S33024-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RICHARD COLLINS | : | |
| | : | |
| Appellant | : | No. 3579 EDA 2019 |

Appeal from the Judgment of Sentence Entered October 18, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005248-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RICHARD COLLINS | : | |
| | : | |
| Appellant | : | No. 3580 EDA 2019 |

Appeal from the Judgment of Sentence Entered October 18, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005249-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RICHARD COLLINS | : | |
| | : | |
| Appellant | : | No. 3581 EDA 2019 |

Appeal from the Judgment of Sentence Entered October 18, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005250-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

J-S33024-21

|  |  |  |  |
|---|---|---|---|
|  | : |  |  |
| v. | : |  |  |
|  | : |  |  |
|  | : |  |  |
|  | : |  |  |
| RICHARD COLLINS | : |  |  |
|  | : |  |  |
| Appellant | : | No. 3582 EDA 2019 |  |

Appeal from the Judgment of Sentence Entered October 18, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003884-2019

BEFORE: BOWES, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED MAY 24, 2022**

Appellant Richard Collins appeals from the judgment of sentence imposed after a jury convicted him of strangulation, involuntary servitude, trafficking in individuals, rape, and aggravated assault.[1] Appellant challenges the trial court's admission of evidence under Pa.R.E. 403 and the amount of restitution. We affirm.

We adopt the trial court's summary of the facts underlying this matter. Trial Ct. Op., 6/8/20, at 2-9. Briefly, Appellant was charged with multiple offenses after he subjected four female victims to involuntary sexual servitude and other crimes during a period of several months. Prior to trial, Appellant filed a motion *in limine* to preclude the Commonwealth from presenting certain photos and videos depicting two of the victims, F.S. and S.C., who were either partially or fully nude. N.T. Trial, 8/6/19, at 26, 31-32. Ultimately, the trial

_____

[1] 18 Pa.C.S. §§ 2718(a)(1), 3012(a), 3011(a)(1), 3121(a)(3), 2702(a), respectively.

- 2 -

court denied Appellant's request to exclude the photos, but ordered the Commonwealth to redact the victims' genitalia and to display the photographs to the jury for no longer than five seconds. *Id.* at 37-38. The Commonwealth also agreed that, "rather than subjecting the jury to the graphic nature of the videos," it would present a detective who could "describe what [was] taking place on the videos, as well as what [was] being said on the videos . . ." N.T. Trial, 8/7/19, at 3.

On August 9, 2019, the jury found Appellant guilty of the above offenses. On October 18, 2019, the trial court sentenced Appellant to an aggregate term of twenty to forty years of imprisonment. The trial court also ordered Appellant to pay $25,000 in restitution to two victims, F.S. and S.C., who were subjected to involuntary sexual servitude. *See* N.T. Sentencing Hr'g, 10/18/19, at 28, 31.

Appellant filed a timely post-sentence motion, which the trial court denied on November 1, 2019.[2] Appellant subsequently filed a timely notice of appeal on Monday, December 2, 2019.[3,4]

---

[2] The docket reflects entry of the order on October 31, 2019, but the actual order is timestamped, and the certificate of service is dated, November 1, 2019.

[3] Because the 30-day appeal deadline fell on a Sunday, Appellant's notice of appeal was timely. *See* 1 Pa.C.S. § 1908.

[4] Appellant filed a separate appeal at each trial court docket pursuant to *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018), and Pa.R.A.P. 341(a). *(Footnote Continued Next Page)*

On March 2, 2020, the trial court ordered Appellant to comply with Pa.R.A.P. 1925(b). Although not reflected on the docket, our review of the record confirms that Appellant filed a timely Rule 1925(b) statement raising multiple issues, including the Commonwealth's use of the explicit photos depicting two of the victims at trial.[5] Trial Ct. Op. at 2. The trial court filed a responsive Rule 1925(a) opinion addressing Appellant's claims.[6]

_____

On June 25, 2020, we consolidated the appeals *sua sponte* pursuant to Pa.R.A.P. 513. Order, 6/25/20.

[5] Because Appellant's Rule 1925(b) statement was not properly docketed, present counsel filed an application seeking leave file a Rule 1925(b) statement *nunc pro tunc*, which this Court denied. However, Appellant included a copy of prior counsel's Rule 1925(b) statement in his brief. Attached to the copy is prior counsel's proof of service, which states that counsel served the Rule 1925(b) statement via the trial court's criminal electronic filing system. *See* Proof of Service, Rule 1925(b) Statement. The proof of service also contains a handwritten note, author unknown, which states that the e-file system was inoperative at the time of filing on March 22, 2020 at 6:04 p.m. *See id.* Likewise, the copy reflects a fax machine date stamp of March 22, 2020. Under the unique circumstances of this case, particularly since the trial court prepared a responsive opinion and accepted the statement as timely filed, we decline to find waiver. *Cf.* Pa.R.A.P. 1925(c)(3); *Commonwealth v. Burton*, 973 A.2d 428, 433 (Pa. Super. 2009) (declining to find waiver because the trial court prepared a responsive opinion to an untimely filed Rule 1925(b) statement).

[6] While this appeal was pending, the Philadelphia County Court of Common Pleas informed this Court that Appellant's counsel, John Belli, Esq., was no longer able to proceed as counsel in any appeal. On March 10, 2022, we issued an order remanding the matter for the trial court to appoint new counsel and providing leave for new counsel to file supplemental briefs within thirty days of appointment. *See* Order, 3/10/22. On March 22, 2022, Stephen T. O'Hanlon, Esq. entered his appearance in this case. However, Attorney O'Hanlon did not file a supplemental brief. Therefore, we address the claims that Appellant raised in his original brief before this Court.

Appellant raises the following issues on appeal:

1. Did the trial court commit an abuse of discretion by permitting the Commonwealth, over objection, to introduce in evidence what essentially were pornographic videos and photographs?

2. Did the trial court impose an illegal sentence of restitution when the amount ordered Appellant to pay was based on mere speculation?

Appellant's Brief at 3.

## Evidentiary Rulings

In his first issue, Appellant argues that the trial court abused its discretion by allowing the Commonwealth to introduce and display videos and photos of two victims, F.S. and S.C. *Id.* at 15. In support, Appellant claims that the photos and videos "had no relevance and any probative value they may have had was clearly outweighed by the prejudice they certainly engendered in the jury." *Id.* Appellant reasons that the "drug use and sex acts depicted in the" exhibits were not relevant to proving "the crimes of human trafficking and involuntary servitude," because the victims were already addicted to drugs. *Id.* at 19. Likewise, Appellant maintains that the evidence, which "display[ed] some of the victims using drugs and under the influence of drugs and also participating in degrading immoral acts," were highly inflammatory and prejudicial. *Id.* at 20. Appellant concludes that because the Commonwealth could have relied on other evidence to "establish what it claimed the photographs and videos depicted," the trial court erred in denying his motion *in limine*. *Id.* at 20.

In reviewing a challenge to the admissibility of evidence, our standard of review is as follows:

> Questions concerning the admissibility of evidence are within the sound discretion of the trial court and we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. If in reaching a conclusion the trial court overrides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. LeClair*, 236 A.3d 71, 78 (Pa. Super. 2020) (citation omitted). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Commonwealth v. Bond*, 190 A.3d 664, 667 (Pa. Super. 2018) (citation omitted).

An error is not harmful or prejudicial, *i.e.*, is a "harmless error," when the Commonwealth proves:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Burno*, 154 A.3d 764, 787 (Pa. 2017) (citation omitted).

> Relevance is the threshold for admissibility of evidence; evidence that is not relevant is not admissible. Pa.R.E. 402. Evidence is relevant if it logically tends to establish a material fact in the case,

tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. Our Rules of Evidence provide the test for relevance: evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. Further, "the court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

*Commonwealth v. Leap*, 222 A.3d 386, 390 (Pa. Super. 2019) (some citations omitted and formatting altered), *appeal denied*, 233 A.3d 677 (Pa. 2020).

Further, this Court has explained:

Evidence will not be prohibited merely because it is harmful to the defendant. This court has stated that it is not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged."

*Commonwealth v. Page*, 965 A.2d 1212, 1220 (Pa. Super. 2009) (citation omitted).

The Crimes Code defines the offense of involuntary servitude as follows:

**(a) Offense defined.—**A person commits a felony of the first degree if the person knowingly, through any of the means described in subsection (b), subjects an individual to labor servitude or sexual servitude, except where the conduct is permissible under Federal or State law other than this chapter.

**(b) Means of subjecting an individual to involuntary servitude.—**A person may subject an individual to involuntary servitude through any of the following means:

(1) Causing or threatening to cause serious harm to any individual.

\* \* \*

(12) Facilitating or controlling the individual's access to a controlled substance.

18 Pa.C.S. § 3012(a)-(b).

Based on our review of the record, we discern no abuse of discretion or error of law in the trial court's ruling. **See LeClair**, 236 A.3d at 78. Specifically, we agree with the trial court that the photos were relevant to prove that Appellant committed the offense of involuntary servitude. **See** Trial Ct. Op. at 14-15. Further, we agree with the trial court that the probative value of the photographs outweighed any prejudice, particularly because the photos were redacted and were displayed to the jury for less than five seconds. **See id.** at 15; **see also Page**, 965 A.2d at 1220 (stating that the court is not required to sanitize the trial by eliminating relevant, albeit unpleasant, facts). Therefore, we affirm on the basis of the trial court's analysis of this issue. **See** Trial Ct. Op. at 10-17.[7]

To the extent Appellant challenges the admission of the videos, he did not raise that issue in his Rule 1925(b) statement. Therefore, this claim is

---

[7] However, we do not adopt the trial court's reliance on unreported Superior Court decisions. **See** Trial Ct. Op. at 15-16 (citing **Commonwealth v. Cintron**, 2019 WL 5549552, at \*6-7 (Pa. Super. filed Oct. 28, 2019) (unpublished memo.), and **Commonwealth v. Nzo-Miseng**, 2015 WL 6941863, at \*2-3 (Pa. Super. filed July 14, 2015) (unpublished memo.)).

waived.[8]  ***See Commonwealth v. Hansley***, 24 A.3d 410, 415 (Pa. Super.

2011) (citations omitted and formatting altered) (stating that "issues not

raised in a Rule 1925(b) statement will be deemed waived for review").

Further, as noted previously, the Commonwealth did not play the videos for

the jury at trial.  ***See*** N.T. Trial, 8/8/19, at 85-87 (reflecting the detective's

testimony describing the contents of the two videos).  Therefore, even if

properly preserved, Appellant would not be entitled to relief on this claim.

### Restitution

In his second issue, Appellant argues that the restitution sentence was

illegal because the amount was based on "mere speculation."  Appellant's Brief

at 21-22.

By way of background to this claim, we note that at sentencing, the

Commonwealth asked the trial court to impose $72,000 in restitution for each

of the two victims who were subject to involuntary servitude.  In support, the

Commonwealth relied on testimony from F.S. and S.C., which reflected that

Appellant received at least $40 from each instance of compelled prostitution

---

[8] In any event, as noted previously, the record reflects that the Commonwealth did not play any videos for the jury at trial.  ***See*** N.T. Trial, 8/8/19, at 85-87 (reflecting the detective's testimony describing the contents of the two videos).  Therefore, even if properly preserved, Appellant would not be entitled to relief on this claim.

by the victims.[9]  N.T. Sentencing Hr'g, 10/18/19, at 28.  The Commonwealth estimated that each victim was forced to participate in at least ten acts per day over several months, for an estimated total of $72,000 each.  *Id.* at 28, 30.

In response, Appellant argued that there was insufficient evidence to establish how much money Appellant actually received, how much he shared, and how much was divided with other people.  *See id.* at 29.  Further, Appellant claimed that, because the victims did not testify at the sentencing hearing about the precise number of instances in which they were forced to engage in prostitution, any amount of restitution would be speculative.  *Id.* at 31.

On appeal, Appellant argues that the trial court calculated the amount of restitution based on the trial testimony of two of the victims "regarding how often they engaged in acts of prostitution and turned over the money" they made to Appellant.  *Id.* at 23-24.  Specifically, Appellant claims:

> [B]y failing to present the testimony of either victim during the restitution hearing the sentencing court was left to speculate what the true amount of restitution was, if any at all.  It cannot be forgotten that the victims were being provided drugs and room and board while in Appellant's residence and thus, some of the money they turned over to Appellant went toward those expenses

---

[9] The record indicates that the term "date" was used by both the Commonwealth and the victims to refer to the instances of forced prostitution. *See, e.g.*, N.T. Sentencing Hr'g, 10/18/19, at 28; N.T. Trial, 8/6/19, at 6 (reflecting the victim's testimony that she was forced to "find a date"). However, given the nature of the acts in this case, we decline to use the term "date" as a descriptor.

> thereby adding more doubt about the figures reached by the sentencing court.

*Id.* at 24 (formatting altered).

Our review of Appellant's restitution claim depends on whether his argument implicates the legality or discretionary aspects of his sentence. It is well settled that a challenge to the legality of a sentence raises a question of law. ***Commonwealth v. Smith***, 956 A.2d 1029, 1033 (Pa. Super. 2008) (*en banc*). In reviewing this type of claim, our standard of review is *de novo* and our scope of review is plenary. ***Commonwealth v. Childs***, 63 A.3d 323, 325 (Pa. Super. 2013). "An illegal sentence must be vacated[.]" ***Commonwealth v. Ramos***, 197 A.3d 766, 769 (Pa. Super. 2018) (citation and quotation marks omitted). Moreover, "a challenge to the legality of the sentence can never be waived and may be raised by this Court *sua sponte*." ***Commonwealth v. Wolfe***, 106 A.3d 800, 801 (Pa. Super. 2014) (citation omitted).

In contrast, a defendant does not have an absolute right to pursue a challenge to the discretionary aspects of a sentence. ***See Commonwealth v. Lamonda***, 52 A.3d 365, 371 (Pa. Super. 2012) (*en banc*). Rather, before reaching the merits of such claims, we must determine whether (1) the appeal is timely; (2) the defendant preserved his issues; (3) the defendant included a concise statement of reasons for the discretionary sentence claim in his brief pursuant to Pa.R.A.P. 2119(f); and (4) the concise statement raises a substantial question that the sentence is inappropriate under the sentencing

code. *See Commonwealth v. Corley*, 31 A.3d 293, 296 (Pa. Super. 2011) (citation omitted).

In *Commonwealth v. Weir*, 239 A.3d 25 (Pa. 2020), our Supreme Court reiterated that "a challenge to the sentencing court's authority to order restitution raises a non-waivable legality of sentencing issue. A challenge to the manner in which the sentencing court exercises that authority in fashioning the restitution implicates the discretionary aspects of the sentence." *Weir*, 239 A.3d at 37. Therefore, when an appellant claims that the trial court lacked statutory authority to impose restitution, it is a legality-of-sentence issue. *See id.* In contrast, where an appellant "challenges only the amount of the award based on the sentencing court's consideration of the evidence of loss presented by the Commonwealth, it is a challenge to the discretionary aspects of sentencing, and [an appellant is] required to preserve it pursuant to Pa.R.A.P. 2119(f)." *Id.* at 38.

Section 1106 of the Crimes Code provides that courts shall sentence offenders to make restitution in certain cases of injury to persons or property. *See* 18 Pa.C.S. § 1106(a). In such cases, restitution is limited to direct victims of the crime and requires a direct nexus between the loss and the amount of restitution. *Id.*

Section 3020 of the Crimes Code sets forth additional provisions that apply when a defendant is convicted of human trafficking involving involuntary servitude. *See* 18 Pa.C.S. § 3020.

In relevant part, Section 3020 provides as follows:

In addition to the provisions of section 1106 (relating to restitution for injuries to person or property), the following shall apply:

(1) A person who violates this chapter shall be ineligible to receive restitution.

(2) The following items may be included in an order of restitution:

(i) For the period during which the victim of human trafficking was engaged in involuntary servitude, the greater of the following:

(A) The value of the victim's time during the period of involuntary servitude as guaranteed under the minimum wage and overtime provisions of the laws of this Commonwealth.

(B) The gross income or value to the defendant of the services of the victim.

(C) The amount the victim was promised or the amount an individual in the position of the victim would have reasonably expected to earn. This clause shall not apply to the amount an individual would have reasonably expected to earn in an illegal activity.

18 Pa.C.S. § 3020(1)-(2)(i).[10]

Here, although Appellant purports to challenge the legality of the restitution sentence, his sole claim is that the amount of restitution was speculative. *Id.* at 21-24. Further, Appellant concedes that the trial court

_____

[10] We also note that under Section 3051, a victim of human trafficking may bring a civil action for actual, compensatory, and punitive damages in addition to other relief. *See* 18 Pa.C.S. § 3051(c).

"was authorized to incorporate restitution as part of its sentence pursuant to 18 Pa.C.S. § 1106(a), and in this case pursuant to 18 Pa.C.S. § 3020." *Id.* at 22. Therefore, because Appellant disputes only the amount of the restitution award, rather than the trial court's authority to impose restitution, it is a challenge to the discretionary aspects of his sentence, which must be preserved for our review. *See Weir*, 239 A.3d at 38.

As noted previously, the record reflects that Appellant preserved his instant claim at sentencing, filed a post-sentence motion, and included the issue in his Rule 1925(b) statement. However, he did not include a Rule 2119(f) statement in his brief. Further, the Commonwealth has objected to this omission on appeal. Therefore, Appellant's discretionary claim is waived. *See Commonwealth v. Kiesel*, 854 A.2d 530, 533 (Pa. Super. 2004) (stating that where an appellant has failed to comply with Pa.R.A.P. 2119(f) and the Commonwealth has objected to the omission, this Court may not review the merits of a discretionary sentencing claim); *see also Weir*, 239 A.3d at 38.

In any event, to the extent Appellant purports to challenge the legality of his restitution sentence, we may address that issue *sua sponte*. *See Wolfe*, 106 A.3d at 801. Here, it is undisputed that the trial court had statutory authority to impose restitution pursuant to 18 Pa.C.S. § 3020. Further, Section 3020(2)(i) authorized the trial court to impose restitution for the period during which the victims were engaged in involuntary servitude,

using the greater of the following figures: the gross income or value received by the defendant, the value of the victim's time based on state wage laws, or the amount the victim reasonably expected to earn from non-illegal activity. 18 Pa.C.S. § 3020(2)(i)(A)-(C).

Here, at sentencing, the Commonwealth asked the trial court to order $72,000 of restitution for each victim, which was based on Appellant's estimated gross income during the time that he subjected the victims to involuntary servitude. *See* N.T. Sentencing Hr'g at 28-30 (reflecting that the victims were in Appellant's home for approximately six months, that S.C. and F.S. were forced to participate in multiple instances of forced prostitution each day, and that Appellant required them to earn at least $40 "per job," all of which went to Appellant). Ultimately, the trial court imposed a restitution amount of $25,000 for each victim. *See id.* at 31.

In its Rule 1925(a) opinion, the trial court reiterated that all of the money earned by F.S. and S.C. was furnished directly to Appellant. Trial Ct. Op. at 34. Further, the trial court explained that the victims' testimony established that F.S. earned an estimated amount between $28,000 and $36,000, while S.C. earned between $48,000 and $57,600.[11] *Id.* However, the court noted that "[t]his is not a scenario that lends itself to an exact

---

[11] The trial court also noted that, even if restitution was calculated based on the minimum wage in Philadelphia, *see* Pa.C.S. § 3020(2)(B)(i)(A), the victims would have earned more than $25,000. *See* Trial Ct. Op. at 34.

evaluation of loss. Based upon the [victims'] testimony, the award of restitution [totaling $25,000 per victim] was neither excessive nor speculative." ***Id.*** at 35.

Under these circumstances, we conclude that the trial court had statutory authority to impose restitution based on 18 Pa.C.S. § 3020. Likewise, because the trial court's restitution award is supported by the record and does not exceed the amount of Appellant's gross earnings,[12] ***see*** 18 Pa.C.S. § 3020(2)(i)(B), Appellant is not entitled to relief. Accordingly, we affirm.

Judgment of sentence affirmed.

Judge McLaughlin joins the memorandum.

Judge Bowes concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/24/2022

---

[12] Indeed, the record reflects that Appellant's earnings were significantly more than the $25,000 restitution that was awarded to each victim.

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :    COURT OF COMMON PLEAS
                                                PHILADELPHIA COUNTY

:    CP-51-CR-   5247-2018
:                       5248-2018

VS.             :                       5249-2018
                                                5250-2018
:                       3884-2019

:    PA SUPERIOR   3579 EDA 2020
:                               3580 EDA 2020

RICHARD COLLINS         :                         3581 EDA 2020
                                                  3582 EDA 2020

: 

OPINION           **FILED**

SCHULMAN, S.I., J.                                    JUN 0 8 2020

                                                 Appeals/Post Trial
                                         Office of Judicial Records

Richard Collins ("Appellant") appeals his convictions and sentence, and this Court submits the following opinion pursuant to Pa. R.A.P. No. 1925, recommending that Appellant's appeal be denied.

## PROCEDURE

On August 6, 2019, this Court granted a motion consolidating five (5) separate cases related to charges involving five (5) different women. (N.T. 8/6/19, pgs. 5-6). On August 9, 2019, a jury found Appellant guilty of the following related to four (4) of those women, each woman under a separate case number:

CP-51-CR-0005248-2018 – Victim: F.S. (27 y.o.): Strangulation, Involuntary Servitude, and Trafficking in Individuals;

1

CP-51-CR-0005249-2018 – Victim: S.C. (28 y.o.): Involuntary Servitude, Trafficking in Individuals;

CP-51-CR-0005250-2018 – Victim: M.M. (21 y.o.): Rape of unconscious person, Trafficking in Individuals;

CP-51-CR-0003884-2019 – Victim: S.C. (21 y.o.): Aggravated Assault, Involuntary Servitude, Trafficking in Individuals.

On October 18, 2019, this Court sentenced Appellant to an aggregate sentence of twenty (20) to forty (40) years' incarceration. Additionally, Appellant was ordered to pay $50,000 in restitution divided equally between two of the victims.

On October 28, 2019, Appellant filed a post-sentence motion, which this Court denied on October 31, 2019. On December 2, 2019, Appellant filed a notice of appeal to the Superior Court, and on March 22, 2020, Appellant filed a Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b).

## FACTS

This case involves crimes against four (4) female victims: 27 year old F.S., 27 year old S.C. (referred to hereinafter as "S.C.27"), 21 year old M.M., and 21 year old S.C. (referred to hereinafter as "S.C.21"). These women were all suffering with drug addiction when they came into contact with the Appellant, who allowed them to stay at his house, and provided them with drugs, specifically heroin. The house was located at 818 East Hilton Street, in the Kensington section of Philadelphia. The events, as described by the witnesses, took place in the spring of 2018. Appellant was taken into custody and arrest warrants were issued on June 18, 2018.

The prosecution's first witness, M.M., testified that she was kicked out of her family's home for using drugs in the spring of 2018. At the time, M.M. was dating one of the other complainants, S.C.27, and they needed a place to stay. M.M. testified that at that time, she and

2

S.C.27 were "dope sick," meaning they were in withdrawal from a heroin addiction. M.M. described that being "dope sick," felt "like the flu, but times like a hundred," including throwing up and being uncomfortable in her own skin. M.M. learned about the Appellant's house from F.S., another complainant, who was a friend of M.M.'s. M.M and S.C.27 decided to go to Appellant's house and he gave them drugs, specifically heroin. After taking the drug, both passed out, and the next thing M.M. remembered was waking up on the couch, completely naked, and knowing that she was raped because her vagina hurt and was wet. (N.T. 8/7/19, pgs. 27-32).

M.M. testified that Appellant raped her repeatedly throughout her time staying at his house. (N.T. 8/7/19, p. 71). She recounted that on one occasion, when she was upstairs sleeping in her bedroom, the Appellant came in and told M.M. it was time to have sex with him. She did not want to do it, but Appellant grabbed her, took her into his room, put her on the bed, and forced her to have vaginal sex with him over her protests to stop. She testified that she also recalled getting high in the bathroom and passing out on the toilet, then waking up and finding that the Appellant had his penis inside of her vagina. When that happened, M.M. would tell Appellant to stop and try to push him off of her, but he would force himself back into her. (N.T. 8/7/19, pgs. 32-35).

M.M. testified that S.C.27 and F.S. worked for an escort agency prostituting themselves. In return for their room and board with Appellant, they would go out to work at night and give him the money they earned. M.M. further explained that Appellant would not allow her to leave the house other than a couple of times when she was allowed to leave to go get drugs. Appellant would give her the money to do that. Occasionally, Appellant would give her money to buy

3

heroin and use his phone to call her mother, but she had to use the phone right in front of him. (N.T. 8/7/19, pgs. 35-37).

The Commonwealth's second witness, F.S., testified that in the spring of 2018 she had admitted herself to a rehabilitation facility for her heroin addiction. She learned about Appellant through another woman at her program, and she decided to leave the facility and go to Appellant's house on Hilton Street. F.S. recounted that when she arrived at Appellant's house, he gave her drugs and told her that he needed to "test [her] out," meaning, have sex with her. She performed oral sex on him and then had vaginal sex with him. F.S. testified that she did not want to do either sex act, but did them because it was only the two of them in the house and she was afraid. (N.T. 8/7/19, pgs. 94-100).

F.S. testified that Appellant explained the arrangement for living at his house, which was that she was expected to provide him with her earnings from her work as a prostitute. Appellant told F.S. that she had to make a certain amount of money each day, and if she did not make enough money, she was forced to go out again later that night to make the amount that Appellant wanted. A month or two after F.S. arrived at the house, Appellant provided her with a cell phone, which she was to use in order to check in with him and notify him about how much money she was making on her "dates." When she would return to the house, she had to give the money she made to Appellant, but sometimes Appellant would give her money back so she could buy heroin for herself. F.S. testified that Appellant told her that if she did not come back to the house with money, he would withhold drugs from her and "watch [her] be dope sick," (meaning "cold turkey" withdrawal). (N.T. 8/7/19, pgs. 100-106).

F.S. further testified that Appellant was physically abusive. On one occasion, he choked her for forgetting to give him $2. In another instance, Appellant slammed her head against the

4

wall with his hand around her neck and her feet dangling above the floor. She stated that she could not breathe and pleaded with him to stop. (N.T. 8/7/19, pgs. 107-109).

F.S. testified that after her first day at Appellant's house, whenever Appellant wanted to have sex with her, he would strap her down to the bed so she could not move. She was afraid that if she did not have sex with him, he would kill her. Appellant intimidated F.S. with stories of things he had done to other women. (N.T. 8/7/19, p. 110).

F.S. explained that there were many times when she did not want to go out to prostitute herself, but she felt she had to go out to make money because Appellant "had [her] completely brainwashed." (N.T. 8/7/19, p. 110). F.S. testified that she went out on four or five dates per night, every day, for months, but she never called the police. She would always go back to the house she was staying in with Appellant. On redirect, F.S. stated that she did not go to the police because she was scared. (N.T. 8/7/19, p. 141). (N.T. 8/7/19, pgs. 137-139, 141).

F.S. identified herself in four (4) photographs that were downloaded from Appellant's cell phone (Exhibits 25A, B, D and F). (N.T. 8/7/19, pgs. 118-120). F.S. identified herself in all four photos and stated that in the photos she was unconscious from taking drugs, including in Exhibit 25B, where she was photographed with her vagina showing (the photograph was redacted to cover F.S.'s genitalia). F.S. testified that at the time they were taken, she was not aware that the photos of her were being taken. (N.T. 8/7/19, pgs. 118-120; N.T. 8/8/19, pgs. 82-83).

The Commonwealth's third witness, S.C.21, testified that she was living at the Appellant's house on Hilton Street in Philadelphia in the spring of 2018, having been introduced to him through a mutual friend. At the time, S.C.21 was struggling with addiction to Fentanyl,

5

heroin and crack cocaine. S.C.21 testified that the first night she was at Appellant's house, he gave her drugs and did not ask anything of her in return. Two or three days later, Appellant told her that in order to stay at the house she had to make money for him through prostitution. She would have "dates" with men, which would involve oral, anal or vaginal sex, and she would be paid for the "date." Initially, S.C.21 found dates on her own, but after about a month, the Appellant signed S.C.21 up for an online escorting service. (N.T. 8/8/19, pgs. 4 -10).

S.C.21 testified that she lived with Appellant on and off, for approximately four (4) months. During that time, she was working everyday, taking about ten (10) to twelve (12) dates per day. Appellant would not allow her to accept less than $40 for a date. She gave all of the money from those dates to the Appellant. Sometimes Appellant would use some of the money to buy drugs for S.C.21. Other times, he would give some of the money to S.C.21 to go buy the drugs. (N.T. 8/8/19, pgs. 10-12). If S.C.21 did not want to go on a date, Appellant would tell her that she would be sick from withdrawal all day and he would not get her well (by giving her drugs). (N.T. 8/8/19, p. 18).

S.C.21 stated that if she did not follow the rules, Appellant would hurt her. She described an incident when she did not want to have sex with the Appellant and he threw hot water on her leg and struck her leg and arm with an extension cord approximately 6 or 7 times, leaving her with bruises and open wounds. (N.T. 8/8/19, pgs. 12-14). Appellant would not allow her to get medical treatment for her injuries (N.T. 8/8/19, p. 25).

S.C.21 explained that although there were times that she had consensual sex with Appellant, on other occasions she was forced. Appellant kept a gun under the mattress in his room, which she had seen, and he told S.C.21 that he had other guns. (N.T. 8/8/19, pgs. 15-16). At the time he was taken into custody, on June 18, 2018, two guns were recovered from the

6

Appellant's property, one of which was hidden under the Appellant's mattress; one was a pellet gun and one contained blanks. (N.T. 8/8/19, pgs. 61, 63).

Appellant also took videos of S.C.21 on his cell phone. One included Appellant telling S.C.21 to "do the crack dance." This video, presented at trial, shows S.C.21 dancing for Appellant while naked. On another video, S.C.21 was shown sucking urine from Appellant's penis and spitting it into the toilet. She testified that she did not want to do these things, but believed that Appellant would hurt her if she did not comply. (N.T. 8/8/19, pgs. 18-19).

In addition to videos, S.C.21 testified that Appellant would also take photos of her on his cell phone.

> He would always take pictures of the females sleeping, including myself. It was for humiliation reasons I am pretty sure. You know, and this one time he took pictures of me sleeping with my vagina wide open. I had a crack stone in my hand. I was totally done. I don't even remember falling asleep that night.

(N.T. 8/8/19, pgs. 23-24). The photo shown at trial (in which genitalia was redacted), shows S.C.21 laying on the bed naked with marks on her leg and arm that she testified were the result of being beaten with the extension cord and scalded with hot water. (N.T. 8/8/19, p. 24).

Several members of the Philadelphia Police Department testified regarding their involvement in the investigation of this matter. Officer Easton Weaver testified that on June 18, 2018, he encountered a woman, S.M., who had cuts and bruises on the inside of her arms, knees

and upper shins. Based on his discussion with S.M.,[1] Officer Weaver completed an incident report and then transported S.M. to the Special Victims Unit. (N.T. 8/8/19, pgs. 43-48).

Police officers Ashley Capaldi and Detective Kathryn Gordon, both of the Special Victims Unit, interviewed the complainants (N.T. 8/8/19, pgs. 57, 67). Detective Gordon prepared a search warrant for the Appellant's property, 818 East Hilton Street, which was executed on June 18, 2018. On that date, Detective Gordon, police officers Capaldi and Gage entered the residence with a SWAT team. Located inside the residence was the Appellant, who was arrested, and the three (3) complainants, who were transported to the Special Victims Unit. (N.T. 8/8/19, pgs. 51-58, 71).

Evidence recovered from 818 East Hilton Street included a black Smith and Wesson pellet gun with a magazine containing 11 pellets, recovered from the front bedroom under the mattress, and one gray compact-length pistol loaded with six blank cartridges, recovered from the top of the kitchen cabinet. (N.T. 8/8/19, p. 73). In addition, two (2) cell phones believed to belong to Appellant were recovered. Detective Gordon applied for, and received a Search Warrant for the cell phones. Photographs and video footage of the complainants were recovered. (N.T. 8/8/19, p. 71).

Specifically, Detective Gordon reviewed photos labeled as Exhibits 25B and 25C. Exhibit 25B depicted F.S. with her genitalia showing. Exhibit 25C shows S.C.21 naked with her genitalia showing. In addition, the phone contained photos of the complainants while unconscious with drug paraphernalia. (N.T. 8/8/19, pgs. 83-84).

---

[1] S.M. did not testify at trial as she passed away prior to trial due to circumstances unrelated to this case. (N.T. 8/8/19, p. 60).

8

Detective Gordon also described two videos of S.C.21 that were contained on the phone confiscated from the Appellant. In one video, Detective Gordon explained that Appellant shows himself and announces that he will be showing the "crack dance." (N.T. 8/8/19, p. 84). Detective Gordon further described the video as follows:

> And then you can see [S.C.21] is completely naked. And [Appellant] is telling her she needs to do the crack dance. And she says that she wants the drugs to feel better. She wants crack. And it continues where he tells her she needs to do the dance, act like you're having a seizure. She says, no, she just wants to get drugs. He continues to tell her she needs to do the dance, go ahead do the dance, which she performs some shaking of her body. And he encourages that and goes back and forth where he tells her she needs to perform oral sex. She begins to do that and says no. There is a back and forth over to do that or not to do that, going back and forth between the two of them. He makes an announcement to the phone that, "This is what white bitches need to do. They don't know respect." And it goes back and forth with that to the point where she is like, no, I don't want to, because he is encouraging that. And it goes back and forth with the two of them struggling over yes or no, until it just ends with them arguing over her trying to kiss his mouth. And it ends with them both saying cut.

(N.T. 8/8/19, pgs. 85-86).

In the second video, consistent with S.C.21's description, the Appellant is standing in the bathroom with S.C.21, who is on her knees and there is a discussion about "she knows what she needs to do." Appellant then has S.C.21 suck urine out of his penis and spit it into the toilet. (N.T. 8/8/19, pgs. 86-87).

Appellant did not present any witnesses or submit any evidence at the time of trial. At the conclusion of the above evidence and testimony, the jury found Appellant guilty of the crimes as stated heretofore.

## ISSUES

Appellant raises the following issues in his Statement of Matters Complained of on Appeal.

1. "During appellant's trial and over his counsel's repeated objections, this Honorable Court allowed the jury to view inflammatory pornographic photographs in violation of Pa.R.Evid. 401 and/or 403 in that the alleged probity was outweighed by the "danger" of

unfair prejudice, confusion of the issues and/or misleading of the jury. Moreover, to the extent that they had no essential evidentiary value, they were inadmissible pursuant to Commonwealth v. Solano, 906 A.2d 1180, 1191-1192 (Pa. 2006). . . ."

2. "The Honorable Court committed reversible error by removing, over defense counsel's objection, a juror without sufficient justification."

3. "Following a Commonwealth witness' unlawful testimony (apparently twice) to the jury regarding the defendant's incarceration status, this Honorable Court denied defendant's mistrial motion."

4. "The Commonwealth during closing argument committed prosecutorial misconduct by falsely telling the jury that defense counsel had engaged in "victim blaming." This Honorable Court compounded the error by denying defense counsel's mistrial motion and his cautionary instruction request."

5. "The bills of information were untimely amended at the time of trial so as to allow the Commonwealth to correct the variance between the indictment/information and the date of the alleged criminal act or acts, contrary to Commonwealth v. Mentzer, 18 A.3d 1200, 1203 (Pa. Super., 2011) and Commonwealth v. Addie Williams, Pa. Super., 6/30/17."

6. "The Honorable Court arbitrarily and summarily ordered $50,000 in restitution without a full hearing on the merits."

## DISCUSSION

1. **Whether the court erred in allowing the jury to view "inflammatory pornographic photographs" of the victims taken from the defendant's cell phone in violation of Pa.R.Evid. 401 and/or 403 in that the alleged probity was outweighed by the "danger" of unfair prejudice, confusion of the issues and/or misleading of the jury and/or because they had no essential evidentiary value.**

The Commonwealth sought to present two (2) photographs to the jury (Exhibits 25B and Exhibit 25C) which depict two of the complainants, F.S. and S.C.21, and were purportedly taken by the Appellant on his cell phone. Exhibit 25B depicts F.S. unconscious lying on her back with her dress lifted up to her hips, her legs spread open and showing her vagina. (Exhibit 25B). Exhibit 25C showed S.C.21 fully naked, lying on her back with her legs spread, and with both her breasts and vagina visible in the photo. (Exhibit 25C). Also visible in the photo of S.C.21,

10

are injuries to her leg and arm, which, according to her testimony, were caused when the Appellant threw hot water at her and then hit her multiple times with an extension cord. (N.T. 8/8/19, p. 24-33).

Having reviewed the photos in question and hearing the parties' arguments, the Court ruled that the Commonwealth was permitted to publish the photos to the jury, however, the photos were to be redacted so that the complainants' genitalia was covered, and they were to be shown to the jury for a very limited amount of time (ie: 5 seconds). (N.T. 8/6/19, pgs. 36-38).

This Court made the following rulings during trial. With regard to Exhibit 25B:

Court: I do not find that that photograph is overly shocking. It is a photograph that would demonstrate the defendant's intent in the fact that he took the photograph himself, that he would show the photograph to the complaining witness, and that his reason for – not reason - but it does demonstrate the defendant's intent in regard to causing or threatening harm, as well as facilitating and controlling access to drugs. So I will allow that photograph.

(N.T. 8/6/19, pgs. 36 -37).

With regard to Exhibit 25C, this Court stated the following:

Court: In regard to 25C, that is of [S.C.21], it clearly depicts a large red gash on her leg. She is naked. And it certainly depicts graphic nudity. And the – again, the intent is shown by the defendant's taking of the photograph, showing of the photograph to [S.C.21] and forcing her to pose. And the claim being that is how her access to drugs were being controlled by the defendant, I will allow the photograph.
Let's understand, however, those two photographs are going to be put up on the screen and immediately taken down. They will not stay up on the screen for more than five seconds.

(N.T. 8/6/19, pgs. 37-38).

When reviewing a trial court's decision to admit or preclude evidence, the Pennsylvania Superior Court must apply an evidentiary abuse of discretion standard of review.

Commonwealth v. Ivy, 2016 PA Super 183, 146 A.3d 241, 250 (2016).

11

The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous. Id.

"When a trial court comes to a conclusion through the exercise of its discretion, there is a heavy burden on the appellant to show that this discretion has been abused." Commonwealth v. Gill, 206 A.3d 459, 466 (Pa. 2019) citing Commonwealth v. Eichinger, 591 Pa. 1, 915 A.2d 1122, 1140 (2007). "An appellant cannot meet this burden by simply persuading an appellate court that it may have reached a different conclusion than that reached by the trial court; rather, to overcome this heavy burden, the appellant must demonstrate that the trial court actually abused its discretionary power." Id.

In his 1925(b) statement, Appellant challenges this Court's rulings on the admission of the photographs based on relevance, and argues that the probative value of the evidence did not outweigh the danger of unfair prejudice, confusion of the issues, and/or misleading the jury.

Pennsylvania Rule of Evidence 401, "Test for Relevant Evidence," provides:

> Evidence is relevant if:
>
> > (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
>
> > (b) the fact is of consequence in determining the action.
>
> Comment: This rule is identical to F.R.E. 401.
>
> Whether evidence has a tendency to make a given fact more or less probable is to be determined by the court in the light of reason, experience, scientific principles and the other testimony offered in the case.
>
> The relevance of proposed evidence may be dependent on evidence not yet of record. Under Pa.R.E. 104(b), the court may admit the proposed evidence on the condition that the evidence supporting its relevance be introduced later.

Pa.R.E. 401.

Pennsylvania Rule of Evidence 403, "Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons," provides:

> The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.
>
> Comment: Pa.R.E. 403 differs from F.R.E. 403. The Federal Rule provides that relevant evidence may be excluded if its probative value is "substantially outweighed." Pa.R.E. 403 eliminates the word "substantially" to conform the text of the rule more closely to Pennsylvania law. See Commonwealth v. Boyle, 498 Pa. 486, 447 A.2d 250 (1982).
>
> "Unfair prejudice" means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.

Pa.R.E. 403.

The Pennsylvania Supreme Court has noted that, with regard to determining whether the probative value of evidence outweighs its prejudicial value,

> This balancing of intangibles—probative values against positive damages—is so much a matter where wise judges in particular situations may differ that a leeway of discretion is generally recognized. J. McCormick, Evidence § 185, at 440.

Commonwealth v. Boyle, 498 Pa. 486, 494, 447 A.2d 250, 254 (1982).

The defense in this case sought to preclude the Commonwealth from publishing the two (2) aforementioned photographs, arguing that they were more prejudicial than probative. After reviewing the photos during an *in camera* hearing, the Court ruled that the photographic evidence was relevant and that the female genitalia portrayed in the photos would be redacted to eliminate any potential inflammatory impact. Further, the Court ruled that the photographs were to be shown to the jury for a matter of seconds. (N.T.8/6/19, pgs. 36-38; 8/7/19 p.118).

Contrary to Appellant's argument, both of the photos at issue were relevant in that they corroborated the complainant's version of events and were necessary to the Commonwealth's

13

ability to prove the elements of Involuntary Servitude. The photographs were among a number of methods Appellant employed to blackmail these women into performing sexual favors as well as turn over their money in exchange for their supply of drugs. Plainly, Appellant was asserting his ability to dominate these women for the purpose of controlling their access to the drugs that he would dole out, and cementing his threat that if they stopped, he would cut off their drug supply and watch them become "dopesick" until they complied. The photographs were properly admitted in that they were relevant; they tended to show that the complainants' version of the facts was more likely true than not; they were redacted to eliminate their possible inflammatory nature; and they were displayed to the jury for a matter of seconds.

Specifically, in regard to photograph 25B, which depicts F.S. unconscious with her genitals displayed, this Court determined that the photo was relevant to the Commonwealth's burden of proving the elements of the charges of involuntary servitude- causing or threatening to cause harm, and involuntary servitude - facilitating or controlling someone's access to controlled substances. By photographing the victim naked and unconscious, and showing the photo to the victim, this would tend to demonstrate the Appellant's intent with regard to causing or threatening harm, as well as facilitating and controlling access to drugs. Furthermore, the photo corroborated the witness' testimony that the Appellant would photograph her when she was unconscious from drug use.

The photo of S.C.21, (Exhibit 25C) depicts the complainant nude and shows a large, red gash on her leg as well as a wound on her arm. She testified that the wounds were sustained when Appellant threw hot water on her and beat her with an extension cord. This photograph was relevant for the purpose of proving the elements of involuntary servitude – facilitating or controlling someone's access to controlled substances in that it demonstrated the Appellant's

14

intent to do so by photographing his victim in a lewd and compromising manner, thus enhancing his ability to keep her under his control.

The probative value of these photographs outweighed the danger of unfair prejudice, confusion of the issues and/or misleading of the jury. Given the definition of "unfair prejudice" provided by the comment to Rule of Evidence 403, the photographs, although unpleasant, were certainly not such that they would have caused the jury to make a decision on an improper basis, nor divert the jury's attention away from its duty of weighing the evidence impartially.

A photograph of the nude female form is not, *per se*, inflammatory, particularly when any potential "shock value" was minimized by redacting the genitalia and limiting the amount of time that the photograph could be shown in court.

Where depiction of the female genitalia is necessary to prove the elements of rape, this Court has previously ruled that such graphic evidence may be relevant and is not so inflammatory as to shock the jury or cause them to make a decision based upon improper evidence. Commonwealth v. Cintron, No. 869 EDA 2018, 2019 WL 5549552, at *6–7 (Unpublished Opinion, Pa. Super. Ct. Oct. 28, 2019) (Trial Court did not abuse its discretion in admitting one photo, deemed inflammatory, of rape victim's genitals where the jury was only permitted to view the photo for a very brief moment, not permitted to take the photograph into the deliberation room, was cautioned prior to the photograph being exhibited in an attempt to partially sanitize the inflammatory nature of the picture, and where the photo's probative value outweighed the prejudice). See also Commonwealth. v. Nzo-Miseng, No. 382 WDA 2014, 2015 WL 6941863, at *2–3 (Unpublished Opinion, Pa. Super. Ct. July 14, 2015)(Photos of rape victim's genital area taken during a medical exam deemed not inflammatory: "While [the

15

photos] are intimate, they are not gruesome or particularly shocking, as the jury, obviously comprised of adults, would be familiar with female genitalia.") Id.

Appellant relies on Commonwealth v. Solano, 588 Pa. 716, 735–37, 906 A.2d 1180, 1191–92 (2006), arguing in his 1925(b) statement that the photos shown to the jury were "inflammatory pornographic photographs," that had no "essential evidentiary value," and that limiting the time that the photos were shown did "absolutely nothing to minimize the improper shock value." However, in Commonwealth v. Solano, supra, a homicide case, the Pennsylvania Supreme Court rejected the argument that potentially gruesome photographs from a crime scene were overly inflammatory and/or prejudicial to the defense. In so doing, the Court considered the admissibility of photographs using a two-part test to determine the admissibility of photos of a crime scene or homicide victim. Accord Commonwealth v. Miller, 268 Pa. Super. 123, 132, 407 A.2d 860, 865 (1979); Commonwealth v. Hetzel, 2003 PA Super 100, 822 A.2d 747, 765 (2003); Commonwealth v. Funk, 2011 PA Super 182, 29 A.3d 28, 33 (2011). The Pennsylvania Supreme Court in Solano stated the following with regard to the admissibility of photographs:

> The admission of photographs is a matter vested within the sound discretion of the trial court whose ruling thereon will not be overturned absent an abuse of that discretion. This Court has long recognized that photographic images of the injuries inflicted in a homicide case, although naturally unpleasant, are nevertheless oftentimes particularly pertinent to the inquiry into the intent element of the crime of murder. In determining whether the photographs are admissible, we employ a two-step analysis.

> First, we consider whether the photograph is inflammatory. If it is, we then consider whether the evidentiary value of the photograph outweighs the likelihood that the photograph will inflame the minds and passions of the jury. Even gruesome or potentially inflammatory photographs are admissible when the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

Commonwealth v. Solano, 588 Pa. 716, 735–37, 906 A.2d 1180, 1191–92 (2006) (internal citations omitted). The Pennsylvania Superior Court has interpreted "inflammatory" to mean the photo is so gruesome it would tend to cloud the jury's objective assessment of the guilt or innocence of the defendant. Commonwealth v. Funk, 2011 PA Super 182, 29 A.3d 28, 33 (2011).

Certainly, this Court did not abuse its discretion in allowing these two (2) photographs of the complainants into evidence, where the intimate areas of anatomy were redacted and the photos were shown to the jury for a very limited amount of time. Inasmuch as the probative value of these photos clearly outweighed any prejudice, this argument does not prevail.

**2. Whether the court erred by removing a juror over defense counsel's objection.**

The court took a short recess after the testimony of M.M. During the recess, the court officer advised the court that juror # 13 spoke to him about a comment she allegedly heard that was made by a juror #4, whom she described as "Gary" wearing a grey shirt. The alleged comment, according to the court officer, was that upon exiting the courtroom and entering the jury room, juror #4 commented that the witness who had just testified (M.M.) "doesn't know what in the hell happened to her." Upon learning this information, the court held an *in camera* hearing with counsel present where both jurors were questioned. (N.T. 8/8/19, proceedings *in camera* pgs. 1-19).

When asked whether he made such a comment, juror #4 at first said he didn't remember making any such comment and he was returned to the jury room. After a few minutes he asked to speak to the court again, so he was brought back for further questioning. He then explained that he might have said something of that nature but that he was on his cell phone

17

talking about a real estate deal. He also said that the conversation he was having was in the courthouse lobby, not in the jury room.

Juror #13 was then questioned about her allegation. She explained that she heard the comment upon entering the jury room for their recess. She described where she was standing in relation to juror #4.

THE COURT: When you were in the room, do you remember where he was standing and where you were standing?

THE WITNESS: Yes. So when I come in, I come into the jury room where that bench is. So I am standing -- that is typically kind of my spot.

THE COURT: The bench that is closer to the door where you come in?

THE WITNESS: Closer to the door, yeah. And the table is in the middle. And he is like catty-corner from me, from where I am standing. So where the end of the table is facing the bench, he is like two or three seats down.

THE COURT: On the side where the windows are?

THE WITNESS: On the side where the windows is, yes.

THE COURT: And he was seated?

THE WITNESS: He was still standing, kind of preparing to sit down.

THE COURT: Were there other jurors standing in your vicinity in that end of the room.

THE WITNESS: Yeah. I mean, we were still shuffling into the room. It wasn't when we were all settled down and sitting when it was said. It was more said as everyone was shuffling into the room and getting seated and figuring out where we are going to sit. We pretty much kind of sit in the same place. We settle into the same section of the room. So that is kind of what we were doing at that time. And it got my attention and made me look up. And we just literally took a break from this person's testimony. And to me, it sounded like what was said appeared to refer to what had just been said at the testimony.

THE COURT: Do you know which other jurors might have been in the same vicinity as you?

THE WITNESS: I don't. I couldn't point them out. I couldn't say for sure, like, which ones. Again, we were all kind of shuffling in. And it got my attention. So I thought about it for

18

the whole day before I said something. I deliberated, I guess, in my own mind whether I should say something. So I just felt like I should.

THE COURT: Thank you. Thank you very much. I think that is all we are going to have to ask you about this.

Ultimately, the court weighed the credibility of each juror and made a determination that juror # 4 equivocated in his responses to the court's inquiry, thus making his explanation less than credible. Initially, juror #4 said he had "absolutely no idea" why someone said they heard such a statement; he followed up with "I certainly don't remember saying it"; and then he told the court that "I believe I said something like that to my real estate agent" while using his cell phone in the courtroom lobby. (N.T. 8/8/19, pgs. 3,4; 7-9).

"The decision to discharge a juror is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. This discretion exists even after the jury has been impaneled and the juror sworn." Commonwealth v. Marrero, 2019 PA Super 253, 217 A.3d 888, 890 (2019) *quoting* Commonwealth v. Carter, 537 Pa. 233, 643 A.2d 61, 70 (1994) (internal citations omitted). "[T]he common thread of the cases is that the trial judge, in [her] sound discretion, may remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired." Commonwealth v. Marrero, 2019 PA Super 253, 217 A.3d 888, 890 (2019) *quoting* Bruckshaw v. Frankford Hosp. of City of Philadelphia, 619 Pa. 135, 58 A.3d 102, 110–11 (2012) (*quoting* United States v. Cameron, 464 F.2d 333, 335 (3d Cir. 1972)).

In weighing whether juror #4 should properly be removed, the court fleshed out the credibility of the testimony of both jurors along with the arguments of counsel, and at first

19

agreed with defense counsel's position; however after Juror #14 was questioned, the court clearly enunciated the reasoning underlying its decision to dismiss juror #4. In summary, the court determined that juror #4 changed his response to the court's questioning several times, whereas juror #13 was very detailed in her account of what she heard and where she heard it, and was certain that the comment was made by juror #4 immediately after the testimony they had just heard. (N.T. 8/8/19 pgs. 15-19).[2]

In the final analysis the court made a sound decision to remove a juror who the court believed had uttered a prejudicial comment about a witness in the jury room, and then was not truthful to the court when being questioned about it.

3. **Whether the Court erred by denying defendant's mistrial motion after a Commonwealth witness testified to the jury regarding the defendant's incarceration status.**

On direct examination, S.C.21 testified as follows:

Prosecutor: I know that you told us that [the cord and hot water] caused an open wound that it left on your arm and your leg. Did you have pain after the incident?

S.C.21: Yes.

Prosecutor: About how long were you in pain?

S.C.21: Probably about a week and a half.

Prosecutor: Okay. And you said that you were not able to get treatment for that?

S.C.21: No. I wasn't allowed to.

---

[2] In an effort to insulate the jury from any possible prejudice that might result in sitting juror #13 (who would have been the first alternate juror), the court proposed sitting juror #13 as the alternate and move juror #14 into the place of juror #4. Both parties agreed (notwithstanding Appellant's objection to removing juror #4).

| | |
|---|---|
| Prosecutor: | When you say you weren't allowed to, who stopped you? |
| S.C.21: | Richard. |
| Prosecutor: | [H]ow did you eventually get out of the house? |
| S.C.21: | A date. A guy I was dating helped me stay away from [Appellant]. And so, I guess, whenever he got incarcerated. And once I found out he was incarcerated – |
| Prosecutor: | Let me ask you, do you remember the police ever coming to talk to you? |
| S.C.21: | Yes. |
| Prosecutor: | Okay. |
| | Your Honor, if the witness may be shown what is marked as C-1. |
| | Do you recognize this document, S.C.21? |
| S.C.21: | Yes. |
| Prosecutor: | What is that? |
| S.C.21: | This is my – I don't know how to say it. An interview from the detective that was interviewing me that day for the special victims unit. |
| * | * * |

(N.T. 8/8/19, pgs. 25-26).

The prosecutor continued and completed her questioning of S.C.21, after which defense counsel began his cross examination. (N.T. 8/8/19, pgs. 26-27). During his cross examination, the following exchange occurred:

| | |
|---|---|
| Defense Counsel: | Now, you – how long were you – when did you first meet [Appellant]? |
| S.C.21: | I don't remember the exact month. |
| Defense Counsel: | But I believe you indicated spring of 2017; is that about right? |
| S.C.21: | That is about right. |
| Defense Counsel: | All right. So spring of 2017. And how long had you been there with [Appellant]? A couple weeks? A couple months? |
| S.C.21: | Probably a couple weeks. And then I reunited with him again. |

21

| | |
|---|---|
| Defense Counsel: | So you left and came back? |
| S.C.21: | Correct. |
| Defense Counsel: | Okay. Why did you come back? |
| S.C.21: | Why did I come back? Because I seen him on Kensington and Allegheny. And the police were sitting across the street, and I had warrants at that time. I didn't want [Appellant] – like he said out his mouth, to start acting crazy. It was either I walk with him or we both go to jail. |
| Defense Counsel: | You just said you had warrants and you just said -- |
| S.C.21: | Correct. |
| Defense Counsel: | -- you were afraid that you would go to jail. Warrants for what? |
| Prosecutor: | Objection. |
| The Court: | Sustained. |

(N.T. 8/8/19, pgs. 29-30).

Defense counsel continued his cross-examination for several more questions, until the witness asked if she could take a break. During the break, defense counsel requested to address an issue with the Court and the following discussion was held on the record:

| | |
|---|---|
| Defense Counsel: | One of the questions I asked the witness was about her and [Appellant] on the corner when she saw some police officers. |
| The Court: | Yes. |
| Defense Counsel: | And that she didn't go to the officers, and she had warrants and didn't want to be arrested. The Commonwealth objected, Your Honor sustained. I am only mentioning that because I am moving for a mistrial. Because prior to that, the same witness testified that two separate times, talked about when [Appellant] was incarcerated. And here we have this witness talking about police contact of the defendant. And then when I tried to go into the police contact with the witness, Your Honor sustained the Commonwealth's objection. My position, Your Honor, is, the statement from the Commonwealth witness, a witness who should have been properly prepped by the Commonwealth, indicated that the defendant was incarcerated. And she mentioned that not once, but twice. Based on that, Your Honor, I move for a mistrial. |

(N.T. 8/8/19, pgs. 32-36).

22

The court denied Appellant's motion for a mistrial and offered several options to cure the potential of prejudice, including an opportunity to rehabilitate the witness and/or an immediate curative instruction, however defense counsel rejected both suggestions and preferred to move on without further reference to the issue. The court did, during its jury instructions, advise the jury as follows:

> "In regard to S.C.21, she included in one of her answers that she thought the defendant was incarcerated at some point. This has nothing to do with this case, and you must completely disregard that part of her answer".

(N.T. 8/9/19, p. 11).

First, to preserve an issue for review, it is fundamental that a party must make a timely objection at trial. See Pa.R.E. 103 (a); Comm. v. Smith, 414 Pa.Super 208, 606 A.2d 939 (Pa.Super 1992). The failure to make a timely objection at trial will result in a waiver of that issue.

Pursuant to Pa.R.Crim.P. Rule 605 (B), when an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; the motion shall be made when the event is disclosed. Otherwise, the trial judge may declare a mistrial only for reasons of manifest necessity.

As evidenced above, counsel for Appellant did not object to the offending testimony at all during the direct examination of the Commonwealth's witness. It was not until the court sustained the Commonwealth's objection during cross-examination of this witness that the Appellant's objection was raised. In fact, it would appear that had the court overruled the Commonwealth's objection, the Appellant's objection would never have been raised at all. Thus, Appellant's complaint that the court committed reversable error in this regard was waived.

23

However, even if the issue was not waived by failure to make a timely objection, this claim must fail.

"The decision to declare a mistrial is within the sound discretion of the court and will not be reversed absent a flagrant abuse of discretion." *See* Commonwealth v. Manley, 985 A.2d 256, 266-268 (Pa. Super. 2009) (citations omitted here). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will ... discretion is abused." Id. A trial court may grant a mistrial only "where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." Id.

It is well established that evidence of other crimes, wrongs, or acts may not be presented during trial against a criminal defendant as either character or proclivity evidence. Pa.R.E. 404(b); Commonwealth v. Thompson, 2014 PA Super 273, 106 A.3d 742, 753 (2014); Commonwealth v. Padilla, 923 A.2d 1189, 1194 (Pa.Super.2007), appeal denied, 594 Pa. 696, 934 A.2d 1277 (2007). However, "mere passing references to prior criminal activity will not necessarily require reversal unless the record illustrates definitively that prejudice results." Thompson, at 753. "Prejudice results where the testimony conveys to the jury, either expressly or by reasonable implication, the fact of another criminal offense. Determining whether prejudice has occurred is a fact specific inquiry." Id. "If evidence of prior criminal activity is inadvertently presented to the jury, the trial court may cure the improper prejudice with an appropriate cautionary instruction to the jury." Id. *quoting* Commonwealth v. Hudson, 955 A.2d 1031, 1034 (Pa.Super.2008), appeal denied, 600 Pa. 739, 964 A.2d 1 (2009). "It is imperative for

24

the trial court's instruction to be 'clear and specific, and must instruct the jury to disregard the improper evidence.'" Id.

Here, the circumstances did not warrant granting a mistrial. The reference to defendant's incarceration was minimal. It was mentioned in the witness' answer to one question and there was no further reference or discussion about it. Furthermore, there were two (2) men being discussed in the context of this witness' answer and it may not have been immediately clear which person she was referring to. Even if the jury were to conclude that the Appellant was incarcerated, any prejudice that resulted from the witness' passing reference to the defendant's incarceration would have been minimal.

The court, in its reasoned judgment, did provide a brief cautionary charge during jury instructions wherein the jury was told to disregard the witness' testimony regarding the Appellant's incarceration status. "The trial court's curative instruction is presumed to be sufficient to cure any prejudice to Appellant." *See* Commonwealth v. Dennis, 552 Pa. 331, 344 (1998); Commonwealth v. Thornton, 791 A.2d 1190, 1193 (Pa. Super. 2002). Insofar as Appellant offers no evidence to rebut the presumption that this Court's instruction cured any prejudice to him, and fails otherwise to specify how the instruction was deficient. His appeal on this ground should be denied.

**4. Whether the Court erred by denying defendant's mistrial motion and cautionary instruction request after the Commonwealth, during closing argument, told the jury that defense counsel had engaged in "victim blaming."**

As noted above, "[t]he decision to declare a mistrial is within the sound discretion of the court and will not be reversed absent a flagrant abuse of discretion." See Commonwealth v. Manley, 985 A.2d 256, 266-268 (Pa. Super. 2009) (citations omitted here). "A trial court may

25

grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." Id.

In this case, during the Commonwealth's closing argument, the prosecutor stated in part:

> Defense wants to distract you. Defense wants to know where are the medical records? Why didn't you call police? Why didn't you leave? And that is all victim blaming. So look at these women who are addicted, who are struggling with there addictions, who don't have access to money, to phones of their own, to food of their own; and to say, well, why didn't you fix it, is just to distract from what he did to them.

> He wants you to look over here and say, well would could you have done? It is not about what they did or didn't do. It is about this man subjecting those women to conditions like that, to manipulating them and abusing their addictions like that.

(N.T. 8/8/19, p. 127).

Defense counsel objected to characterization of his argument as "victim blaming" and sought mistrial and/or a cautionary instruction prior to charging the jury. (N.T. 8/8/19, p.139).

"It is well settled that a prosecutor has considerable latitude during closing arguments and [her] arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence." See Commonwealth v. Judy, 978 A.2d 1015, 1020 (Pa. Super. 2009) (citations omitted here). "Further, prosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. Prosecutorial misconduct is evaluated under a harmless error standard." Id.

"[T]he propriety of the prosecution's remarks in closing argument must be evaluated in light of defense counsel's comments in closing." See Commonwealth v. Ragland, 991 A.2d 336, 341 (Pa. Super. 2010) (citations omitted here). "In determining whether the prosecutor engaged

26

in misconduct, [courts] must keep in mind that comments made by a prosecutor must be examined within the context of defense counsel's conduct." Id. A prosecutor "may fairly respond to points made in the defense closing," and "misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair." Id.

Defense counsel argued in his closing argument:

> When these witnesses that you heard talk about the injuries and the assaults and the violence inflicted upon them, as a human being, you are going to be sympathetic. But where is the medical records? Where is the police report? If this guy did this to you on January 1, 2018, why didn't you go to the police on January 1, 2018? Or why didn't you go to the hospital?
>
> &ast;    &ast;    &ast;
>
> There is one witness, ladies and gentlemen, who said this man grabbed her by the neck, slammed her up against the wall so much so that her feet were dangling from the wall. So she is up against the wall off the floor, he has her by the neck, and her feet are dangling; and she never went to the hospital. And she never told the police. My question to you is, is that kind of testimony credible?

(N.T. 8/8/19, pgs. 102-103).

> You have witnesses who, in one instance, one woman said that she went out at least 2,000 times. Went out at least 2,000 times. Each time, she had a cell phone. Most times had a cell phone. Or sometimes had a cell phone. You can determine how many times she had a cell phone when she went out 2,000 times. And not once during those 2,000 times, when she was away from Richard Collins, did she ever call the police; did she ever go to the hospital. Did she ever provide any type of corroboration that would show that she is credible?
>
> &ast;    &ast;    &ast;
>
> There was one or two testified that they actually left Richard. They left him to leave or stay elsewhere and then came back. But neither one of those witnesses said, "Hey, he went out looking for me, grabbed me by the neck, and brought me back." They came back.

(N.T. 8/8/19, p. 105).

Defense counsel made these arguments ostensibly to show that the victims were not reliable witnesses and could not be believed because if someone was that injured, or that scared,

27

and had the opportunity to get help, she would have gotten help. However, by repeatedly suggesting that the victims had ample opportunity to go out, call the authorities, go to the hospital, etc., the unavoidable suggestion is that it the victims were complicit – they had plenty of opportunity to leave, to save themselves, but chose not to do so.

Accordingly, the Court ruled that the prosecutor's counter-statement regarding "victim blaming" – in response to defense counsel's repeated suggestions that the victims could have left, was appropriate "when examined within the context of defense counsel's conduct." Ragland, *supra*.

Furthermore, as noted above, "[p]rosecutorial misconduct is evaluated under a harmless error standard." Judy, 978 A.2d 1015, 1020. In other words, "a prosecutor's arguments to the jury are not a basis for the granting of new trial unless the *unavoidable effect* of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict." Commonwealth v. Weiss, 565 Pa. 504, 521-522 (2001) (emphasis in original); Commonwealth v. Paxton, 2003 Pa. Super. LEXIS 445, *18-19 (Pa. Super. 2003).

Here, the prosecutor's comment that defense counsel was victim blaming is a direct response to defense counsel's repeated references to the opportunities the victims had to get away from the Appellant. Such an argument does not create a fixed bias or hostility toward Appellant and therefore is not grounds for a new trial. The testimony the victims provided regarding the conditions at the Appellant's property and his treatment of them was ample evidence upon which to convict the Appellant.

5. **Whether the Court erred in allowing the Commonwealth to untimely amend the bills of information at the time of trial to correct the variance between the indictment/information and the date of the alleged criminal acts where there was admittedly no prejudice to the defendant as a result of the late amendment.**

On the first day of trial, the Commonwealth brought to the Court's attention a mistake on the

bills of information, which it sought to correct.

| | |
|---|---|
| Prosecutor: | Your Honor, in reviewing the bills in preparation for trial, I did alert [defense counsel] that the dates on the bills are incorrect. At the appropriate time, I would just ask Your Honor for leave to be able to amend the dates on the record. |
| * * * | |
| Court: | ...And then there is an amendment to the dates and the bills of information. |
| * * * | |
| Prosecutor: | Your Honor, as to all the bills, I would ask that there be a date range of March 2018, through July of 2018. I did email [defense counsel], and that is reflected in discovery. |

(N.T. 8/6/19, p. 6).

| | |
|---|---|
| Defense Counsel: | "[O]n Friday, August 2 of 2019, just a few days ago, the Commonwealth did send me an email indicating that it wanted to amend the bills of information to show – I believe it was March of 2018 until late July of 2018. I notice from the bills of information I received in connection with discovery that it shows March of 2019, not March of 2018. And based on that and the fact that the amendment by the Commonwealth was even past the 11th hour, I would object based on that. |
| The Court: | All right. And, again, I will just revisit, has there been any prejudice to your client because of the late amendment? |
| Defense Counsel: | And I am going to be quite candid, Your Honor, as his Counsel, I don't see any. But without disclosing the confidential communication between us, his position is that he has an alibi for the date on the bill of information, March of 2019. .... And in that alibi, since the jury is not here, is that he was in custody. |
| The Court: | Okay. But that is the wrong year....Obviously. It's just not even close to the right time period. It's the totally wrong --- |
| Defense Counsel: | I just wanted to answer your question directly. There has been communication, and my client certainly wanted me to raise that issue, and I raised it, and I understand Your Honor's position. |

29

(N.T. 8/7/19, pgs. 4-5).

Rule 564 of the Pennsylvania Rules of Civil Procedure provides:

> [t]he court may allow an information to be amended, provided that the information as amended does not charge offenses arising from a different set of events and that the amended charges are not so materially different from the original charge that the defendant would be unfairly prejudiced. Upon amendment, the court may grant such postponement of trial or other relief as is necessary in the interests of justice.

Pa.R.Crim.P. 564.

In a recent decision, the Pennsylvania Superior Court provided a comprehensive review of the Pennsylvania jurisprudence related to both the purpose of Rule 564 and the standards by which Pennsylvania courts assess a challenge to an amendment of information:

> The purpose of this rule is to "ensure that a defendant is fully apprised of the charges, and to avoid prejudice by prohibiting the last minute addition of alleged criminal acts of which the defendant is uninformed." The test to be applied when evaluating a challenge to an amended information[, as] set forth in Commonwealth v. Bricker, 882 A.2d 1008, 1019 (Pa.Super. 2005) (citation omitted)[, is]:

> Whether the crimes specified in the original indictment or information involve the same basic elements and evolved out of the same factual situation as the crimes specified in the amended indictment or information. If so, then the defendant is deemed to have been placed on notice regarding his alleged criminal conduct. If, however, the amended provision alleges a different set of events, or defenses to the amended crime are materially different from the elements or defenses to the crime originally charged, such that the defendant would be prejudiced by the change, then the amendment is not permitted.

> Relief is warranted only when the amendment to the information prejudices a defendant. Factors to be considered when determining whether Appellant was prejudiced by the Commonwealth's amendment include whether the amendment changes the factual scenario; whether new facts, previously unknown to appellant, were added; whether the description of the charges changed; whether the amendment necessitated a change in defense strategy; and whether the timing of the request for the amendment allowed for ample notice and preparation by appellant.

Commonwealth v. Jackson, 2019 PA Super 221, 215 A.3d 972, 979–80 (2019) (internal citations omitted).

Appellant relied on Commonwealth v. Mentzer, 18 A.3d 1200, 1203 (Pa. Super., 2011) and Commonwealth v. Williams, 2017 PA Super 204, 166 A.3d 460, 462 (2017) to support his position, neither of which are particularly helpful to said position. In Mentzer, the defendant was charged and found guilty of driving under the influence - first offense. Just prior to sentencing, it was discovered that defendant had a prior DUI from another state. The Commonwealth therefore sought to change the charge from first offense to second offense, which the trial court granted. The Superior Court found this was appropriate given the totality of the circumstances.

Commonwealth v. Williams, is similarly unhelpful to Appellant's position in that the Commonwealth moved to amend after the close of evidence to include a completely different charge that had been previously dismissed. The Superior Court found that since the charges were different, defense counsel was deprived of any realistic opportunity to prepare or present a defense to this new and different charge during trial.

The cases cited by Appellant are inapposite to the facts presented here. Here, the Appellant was on notice of the charges filed against him and was on notice of the factual basis for those charges. The change to the bills of information in this case related to what amounts to a typographical error – the original bills included a time period of March of 2019 through July of 2018. The Commonwealth was permitted to corrected the bills to reflect March of 2018, instead of March of 2019. Not only did the original time frame not make sense, but all testimony and documents in this matter referenced 2018, not 2019.

Furthermore, while defense counsel noted that Appellant had an alibi for the 2019 date because he was incarcerated, defense counsel admitted that he did not see any prejudice as a result of the change to the bills of information. Indeed, the Appellant was fully apprised of the charges against him and was prepared for trial. Appellant shall not take advantage of a clerical

31

error from which he admittedly suffered no prejudice. Commonwealth v. Thomas, 328 Pa. Super. 393, 405, 477 A.2d 501, 507 (1984).

**Whether the Court erred in ordering $50,000 in restitution where there was no full hearing on the merits.**

At sentencing, the Commonwealth sought restitution on behalf of victims F.S. and S.C.21 in the amount of $72,000.00 per complainant, pursuant to the Restitution section of the Human Trafficking statute, 18 Pa.C.S.A. §3020. The court ordered restitution in the amount of $25,000.00 for each complainant.

## 18 Pa.C.S.A. § 3020

In addition to the provisions of section 1106 (relating to restitution for injuries to person or property), the following shall apply:

(1) A person who violates this chapter shall be ineligible to receive restitution.

(2) The following items may be included in an order of restitution:

(i) For the period during which the victim of human trafficking was engaged in involuntary servitude, the greater of the following:

**(A) The value of the victim's time during the period of involuntary servitude as guaranteed under the minimum wage and overtime provisions of the laws of this Commonwealth.**

(B) The gross income or value to the defendant of the services of the victim.

(C) The amount the victim was promised or the amount an individual in the position of the victim would have reasonably expected to earn. This clause shall not apply to the amount an individual would have reasonably expected to earn in an illegal activity.

(ii) The return of property of the victim of human trafficking, cost of damage to the property or the replacement value of the property if taken, destroyed or damaged beyond repair as a result of human trafficking.

(3) Collection and distribution of restitution payments shall be governed by the provisions of 42 Pa.C.S. §§ 9728 (relating to collection of restitution, reparation, fees, costs, fines and penalties), 9730 (relating to payment of court costs, restitution and fines) and 9730.1 (relating to collection of court costs, restitution and fines by private collection agency).

Appellant objected to the amount of restitution being sought, and argues that the $50,000 in restitution was arbitrarily and summarily ordered without a full hearing on the merits. That is, Appellant is not arguing that restitution is not permissible under the statute, but rather that the amount ordered is not supported by the record. [3] In Commonwealth v. Boone, 862 A.2d 639, 643 (Pa. Super. 2004) the Superior Court has held:

> When fashioning an order of restitution, the lower court must ensure that the record contains the factual basis for the appropriate amount of restitution. Commonwealth v. Pleger, 934 A.2d 715, 720 (Pa. Super. 2007). The dollar value of the injury suffered by the victim as a result of the crime assists the court in calculating the appropriate amount of restitution. Id. The amount of the restitution award may not be excessive or speculative. Commonwealth v. Rush, 909 A.2d 805, 810 (Pa. Super. 2006)[ ]. It is well-settled that "[a]lthough it is mandatory under section 1106(c) to award full restitution, it is still necessary that the amount of the 'full restitution' be determined under the adversarial system with considerations of due process." Commonwealth v. Ortiz, 854 A.2d 1280, 1282 (Pa. Super. 2004).

Commonwealth v. Atanasio, 997 A.2d 1181, 1183 (Pa. Super. 2010).

The amount of restitution ordered by this Court was supported by the trial record. Specifically, at trial, F.S. testified that she met the Appellant at the end of 2017 and that in order to get her supply of heroin, she had to work as a prostitute to make money for Appellant. F.S testified that she would normally go out on four to five "dates" per night while prostituting. She stated that this occurred everyday for months. (N.T. 8/7/19, pgs. 100, 126, 134, 137-138). When she would return to the house, she had to give the money she made to Appellant. Appellant told F.S. that she had to make a certain amount of money each day and that if she did not make

---

[3] The court is cognizant that Section 1 (i) (C) of the statute prohibits restitution for expected earnings in an illegal activity. It should be noted that Appellant did not raise an issue regarding the court's statutory authority to award restitution, but merely to the amount awarded. Furthermore, section 1 (i) (A) clearly entitles an award of restitution for the actual value of the victim's time during the period of servitude as calculated by the applicable minimum wage. Section 1 (i)(C) of the statute, however, speaks to "promised" or "expected" earnings, which this court interprets to apply to earnings beyond the minimum wage that a victim might have garnered.

33

enough money, she was forced to go out again later that night to make the amount that Appellant wanted. (N.T. 8/7/19, pgs. 100-106. 126, 134-138).

S.C.21 testified that she lived with Appellant for approximately four (4) months. During that time, she was working everyday, taking about ten (10) to twelve (12) "dates" per day. Appellant would not allow her to accept less than $40 for a date. She gave all of the money from those dates to the appellant. (N.T. 8/8/19, pgs. 10-12).

Therefore, with regard to F.S., her testimony supports approximately 6 months of work, from December 2017, when she first met the Appellant, until June 2018, when the warrant was executed on Appellant's property. Four (4) to five (5) dates per day, everyday, for six (6) months, would be 720 to 900 dates. Estimating $40 per date based on S.C.21's testimony, the total would be $28,800 to $36,000. The minimum wage in Philadelphia in 2018 was $12/hour, so even at minimum wage for a 40 hour work week for 6 months, F.S. would have earned over $28,000.00.[4]

With regard to S.C.21, her testimony supported ten (10) to twelve (12) dates per day, everyday for four months, which comes to 1,200 to 1,440 dates. At $40 per date, that totals $48,000 to $57,600. Minimum wage for four (4) months in 2018 would have been $19,200.00, however, S.C.21 testified that she was forced to take ten (10) – twelve (12) "dates" per day.

The imposition of restitution is controlled by Section 1106 of the Crimes Code which provides in relevant part, that "the court shall order full restitution ... regardless of the current financial resource of the defendant, so as to provide the victim with the fullest compensation for

---

[4] Although there was no testimony regarding the minimum wage applicable in 2018, the court takes judicial notice that Philadelphia's minimum wage was $12/hour.

34

the loss." 18 Pa.C.S. § 1106(c)(1) (italics added for emphasis). This is not a scenario that lends itself to an exact evaluation of loss. Based upon the testimony, the award of restitution was neither excessive nor speculative. Accordingly, the appeal on this ground should be dismissed.

## CONCLUSION

For the reasons set forth in the foregoing Opinion, this Court's judgment of sentence should be affirmed.

BY THE COURT:

DATE: 6/8/20

SUSAN I. SCHULMAN, J.

35